**GSW, INC., f/k/a Allsafe Waste Management, Inc., Plaintiff–Appellee,**

v.

**LONG COUNTY, GEORGIA, Defendant–Appellant.**

No. 92–8732.

United States Court of Appeals, Eleventh Circuit.

Sept. 2, 1993.

---

6. This excludes a 1985 conviction which apparently was subsequently overturned.

Albert Rahn, III, Gleenville, GA, Stephen E. O'Day, Smith Gambrell & Russell, Atlanta, GA, for defendant-appellant.

Brian J. Passante, Sell & Melton, Macon, GA, for plaintiff-appellee.

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

Before KRAVITCH and HATCHETT, Circuit Judges, and ATKINS *, Senior District Judge.

KRAVITCH, Circuit Judge:

Allsafe Waste Management, Inc. (Allsafe) brought suit in district court alleging that Long County unconstitutionally had rescinded a contract between Allsafe and the County regarding a solid waste landfill facility which was to be owned privately by Allsafe and located in Long County. Allsafe asserted that the County violated the Commerce Clause because its rescission was based on Allsafe's refusal to agree to a 150–mile geographic limitation on the source of waste. Long County filed a motion seeking dismissal of the Commerce Clause claim and Allsafe's companion equal protection claim. Allsafe petitioned for a preliminary injunction to prevent the County from acting on the rescission. The district court dismissed Allsafe's equal protection claim, denied the motion to dismiss the Commerce Clause claim and granted a preliminary injunction against the County. Long County seeks review of the denial of its motion with respect to the Commerce Clause claim and to the issuance and breadth of the injunctive order. We affirm the district court.

I.

Long County is a political subdivision of the State of Georgia, acting through its elected Board of Commissioners. As of 1990, Long County did not have a municipal solid waste facility, but had relied upon a facility in Wayne County for the disposal of its waste. In 1990, Wayne County indicated that it would have to limit the intake of Long County's waste and consequently, Long County began to explore alternatives for its waste disposal.

In the summer of 1990, Long County began negotiations with Ocmulgee Disposal, Inc., a predecessor to Allsafe, for the con-

struction of a private solid waste facility in Long County. On November 6, 1990, Long County and Ocmulgee Services, Inc. (OSI), a sister corporation to Ocmulgee Disposal, entered into an agreement whereby the company agreed to build the facility and charge a "tipping fee" to all users, with a percentage of the revenues going to the County. The County agreed to provide technical assistance, to license the facility and to communicate its support for the project to the appropriate regulatory agencies. The contract did not mention any geographic restrictions on the origin of the waste and specifically authorized the company to accept waste from areas outside of Long County, as long as the facility complied with federal and state law.

In March 1991, the Long County Board of Commissioners sent a letter to OSI stating that the Board of Commissioners passed a resolution limiting the transportation of refuse to waste generated within 150 miles of Long County.[1] In August 1991, Long County agreed to an assignment of interests from OSI to Allsafe. Allsafe was later renamed GSW, Inc. and O & G Industries Inc., a Connecticut company, acquired 52% of GSW's shares.[2]

After the assignment to Allsafe, Long County sent a letter seeking assurances from the company, including commitments to construct a recycling facility, to pay $25,000 for the County to hire engineering consultants, to reserve sufficient space for the County's waste over the 50-year term of the contract and to limit the origin of the waste to within 150 miles of Long County. Allsafe viewed the letter as an attempt to alter the terms of the original contract and refused to give the assurances requested. The County, inter-

preting Allsafe's refusal as a material breach, wrote a letter to Allsafe rescinding the contract. Allsafe then filed suit against the County on the ground that the County was rescinding the contract in an attempt to discriminate against interstate commerce.

## II.

### A.

Before addressing the substance of the Commerce Clause claim, we note the procedural posture of the case. We are asked to review the district court's decision to deny a motion to dismiss the claim. The appropriate standard for deciding to dismiss a claim is whether it appears beyond doubt that the plaintiff can prove no set of facts to support his claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). All facts set forth in the complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto. *See* Fed.R.Civ.P. 10(c). We review the district court's legal conclusions *de novo.*

### B.

■ The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce ... among the several states." U.S. Const. art. I, § 8, cl. 3. Implied in the granting of this power to Congress is a limitation on the state's ability to isolate itself from the national economy and usurp Congress's power; this restriction on the states is often referred to as the negative or dor-

---

1. There is some conflict in the record concerning the circumstances surrounding the resolution. Long County claims that there is no reliable evidence that the resolution was ever passed. The County also maintains that OSI negotiated with the County concerning the geographic restriction and agreed to abide by the 150 mile limit. The County cites a March 21, 1991 letter from Sonny Livingston, an officer of OSI, to the Board of Commissioners which, on its face appears to agree to the limit. These facts are not relevant to the Motion to Dismiss because the defendant expressly stated that its motion relied only on the facts in the complaint and accompanying exhibits, which did not contain the March 21st letter. The complaint states that the County

unilaterally attempted to impose the restriction and an exhibit to the complaint states that the Commission passed a resolution imposing a geographic limit on the source of waste. *See* Plaintiff's Complaint for Injunctive and Declaratory Relief, R1–1 at § 12 and Ex. E. We accept these facts as true for the purposes of the motion to dismiss.

2. For simplicity, the waste disposal company will be referred to as Allsafe because that name is predominantly used in the record and was the company's name during the majority of the time period at issue in this case.

mant Commerce Clause.[3] At its most basic level, the dormant Commerce Clause stands for the principle "'that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate, or restrain it.'" *Hughes v. Alexandria Scrap Co.*, 426 U.S. 794, 808, 96 S.Ct. 2488, 2497, 49 L.Ed.2d 220 (1976) (quoting *Hood & Sons v. Du Mond*, 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949)).

The Supreme Court, however, has developed an exception to the broad reach of the dormant Commerce Clause to address situations where a state is acting as a participant in the market, rather than as a regulator.[4] The County contends that it was acting as a market participant when it purchased the right to use the landfill and receive revenue from it pursuant to the contractual agreement. Thus, the County argues that its actions fall outside of the Commerce Clause as a matter of law and that the district court erred when it refused to exempt the County's actions from constitutional scrutiny. Allsafe contends that the County was acting as a market regulator by imposing a restriction on trade, so its actions fall within the reach of the clause.

The market participant doctrine upon which the County relies is a relatively new and difficult area of the Supreme Court's jurisprudence. The Court has recognized that "[t]he precise contours of the market-participant doctrine have yet to be established." *South Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 93, 104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1984). To date, the Court has applied the doctrine in only four cases. *See supra* note 2. In addition, one of our sister circuits has noted the considerable practical difficulty in distinguishing between a "market regulator" and a "market participant." *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1056 (9th Cir. 1987).

The Supreme Court first articulated the market participant doctrine in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), which involved Maryland's statutory scheme whereby the State would pay bounties for the destruction of, any vehicle titled in Maryland, but out-of-state scrap processors were required to provide more extensive documentation to show that the vehicle was abandoned and the wrecker had clear title. The Court held that Maryland's scheme was not the kind of action covered by the Commerce Clause because the State had entered the market itself. *Id.* at 806, 96 S.Ct. at 2496. The Court distinguished a long line of Commerce Clause cases by noting that

> [t]he common thread of all these cases is that the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation. By contrast, Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price.

*Id.*

The Court then reviewed the history and purpose of the Commerce Clause, which was designed to prevent states from erecting trade barriers that would undermine efforts to form a cohesive nation. Thus, states were prohibited from enforcing restrictions and regulations on the free flow of commerce. The Court concluded that this goal is not impeded by allowing a state to participate in a market and favor its own citizens over others. *Id.* at 808–09, 96 S.Ct. at 2497.

The Court revisited the market participant doctrine in *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), a case challenging South Dakota's practice of limiting the sale of cement produced at a state-owned plant to state residents in time

---

**3.** The Supreme Court has noted that the Commerce Clause "was designed in part to prevent trade barriers that had undermined efforts of the fledgling States to form a cohesive whole following their victory in the Revolution." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 807, 96 S.Ct. 2488, 2496, 49 L.Ed.2d 220 (1976).

**4.** *Alexandria Scrap; Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *White v. Massachusetts Council of Construction Employees*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *South Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984).

of shortage. The Court reaffirmed its holding in *Alexandria Scrap* and again explained the reasoning behind its decision in that case. The Court stated that "[t]here is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." *Reeves,* 447 U.S. at 437, 100 S.Ct. at 2277. It further reasoned that South Dakota, as a seller of cement, fit the description of a market participant even better than Maryland, which was subsidizing local producers. *Id.* at 440, 100 S.Ct. at 2271. Moreover, the Court found that South Dakota's program was not objectionable because it merely limited the benefits of a state program to those who fund such programs with state taxes. The Court noted that the citizens of South Dakota bore the business risk by setting up the plant at a cost of two million dollars from the state treasury. *Id.* at 442, 100 S.Ct. at 2280.

After reaffirming the market participant doctrine in *Reeves,* the Court extended it in *White v. Massachusetts Council of Construction Employees,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), to permit a city to require that at least half of the workforce used to complete all construction projects funded in whole or part by city funds must be comprised of city residents. The Court limited its consideration to the issue of whether the Commerce Clause prohibited such restrictions on projects funded wholly with city funds and those funded by the city and federal government. *Id.* at 208–09, 103 S.Ct. at 1045. The Court acknowledged that there are "some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business." *Id.* at 210 n. 7, 103 S.Ct. at 1046 n. 7. The Court declined to define those limits, noting that in the case at hand, everyone affected by the city's policy was in "a substantial, if informal sense" employed by the city. *Id.* Thus, the city's restriction fell within the scope of the market participant doctrine.

In *South Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), however, a plurality of the Court found an example of a policy which went beyond the limits of the market participant doctrine. The Alaska Department of Natural Resources published a notice that it would sell timber to the highest bidder, but that bidder must agree to partially process the timber within the state before exporting it. The State charged a lower price for timber sold with this restriction.

The Court distinguished the Alaskan policy from Maryland's subsidy scheme at issue in *Alexandria Scrap* because the Alaskan policy did not offer the buyer a choice between complying with the requirement and getting a subsidy or noncompliance with no subsidy. Instead, the buyer had to abide by the limitation or be precluded from buying timber. *Wunnicke,* 467 U.S. at 95, 104 S.Ct. at 2244. The Court also distinguished *Reeves* because the *Wunnicke* case involved three factors not present in *Reeves:* foreign commerce, a natural resource and restrictions on resale. *Id.* at 96, 104 S.Ct. at 2245. The Court finally distinguished *White* because the Alaskan policy went beyond the normal buyer-seller relationship and attempted to impose post-sale obligations in which the seller usually has no interest. *Id.* The Court concluded that the market participant doctrine "is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity." *Id.* at 97, 104 S.Ct. at 2245.

In the instant case, Long County claims that its rescission of the contract falls within the market participant doctrine and is analogous to the schemes at issue in *Alexandria Scrap, Reeves* and *White.* The County argues that it is merely fixing the terms and conditions upon which it will make a needed purchase, the very essence of economic participation. Allsafe counters by offering examples of the similarities between the instant case and *Wunnicke* and distinguishing the cases relied upon by the County. Allsafe argues that the County has not expended or risked any capital in the project and thus, cannot be a market participant. Allsafe also notes that the company is not a major participant. We agree with Allsafe for the reasons explained below.

## C.

Although the County maintains that *Alexandria Scrap, Reeves,* and *White* are controlling, there is a critical distinguishing factor between these cases and the instant case. Unlike the governmental entities in the Supreme Court cases, the County here has not invested, expended or risked any public funds in any aspect or stage of the venture. It did not invest or risk any capital in the siting, construction, preparation, or operation of the landfill.[5] The contract at issue expressly provides that the County will not be responsible for any expenditures or liability.[6]

In contrast, public funds were clearly at stake in *White, Reeves* and *Alexandria Scrap.* In *White,* Boston paid its contractors for construction services. *Reeves* involved a state-owned manufacturing plant. Maryland used state funds to pay a bounty to scrap processors in *Alexandria Scrap.*

The County's failure to expend or risk public funds has several ramifications which negate a finding of market participation. First, it indicates that the County is acting more as a regulator because its policies affect a private company which incidentally benefits from the County's policy decision regarding waste disposal. The *White* Court took pains to note that it was restricting its analysis to the city's policy as it affected contracts funded with city or federal monies and not private investment. The Court stated that the limited effect of the city's policy distinguished it from *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), in which the Court struck down an Alaskan statute requiring that all jobs relating to oil and gas leases be offered first to state residents. The *White* Court quoted *Hicklin* in describing Alaska's scheme as " 'an attempt to force virtually all businesses that benefit in some way from the economic ripple' " of Alaska's development of its natural resources, to discriminate in hiring in favor of state residents. 460 U.S. at 211, 103 S.Ct. at 1046 (quoting *Hicklin,* 437 U.S. at 531, 98 S.Ct. at 2490). *White* was different, the Court held, because the restrictive policy was limited to city funded projects; thus, it did not reach "virtually all businesses" that benefitted from the city's desire to develop its construction. *White,* 460 U.S. at 211, 103 S.Ct. at 1046.

In the instant case, the landfill was to be wholly owned by Allsafe, a private company. Allsafe assumed all risk of failure and liability. Thus, the County was maintaining a policy which would restrict the return on the investment of private actors and would regulate a private company. The County was attempting to control a business that happened to benefit from the County's desire to develop a plan for waste disposal.

The *Reeves* Court noted that the expenditure of public funds legitimizes a protectionist policy because the restriction merely "limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve." 447 U.S. at 442, 100 S.Ct. at 2280. Here, the County is attempting to gain benefits for its constituents without providing any funding for the program, rendering the policy more regulatory than participatory.

Furthermore, the market participant doctrine relies upon the premise that economic

---

5. The district court appeared to construe the market participant doctrine as requiring state or county ownership of the landfill. This goes too far. The public entity need not own the operation to be a market participant, but it must risk or expend public funds in some way. We decline to define the economic involvement necessary to qualify as a market participant, but merely note that the facts of this case do not support such a finding. The County is a non-exclusive purchaser of services, which has not risked or invested any capital to merge its interests with Allsafe, the intermediary between the County and third party purchasers of waste disposal services.

6. The contract specifically states that "the County.... makes no commitment for the expenditure of public funds in connection with the undertakings and obligations set forth in this Agreement; provided, however, that the County may from time to time elect to utilize its own personnel or independent engineers or consultants." R1–22, Ex. A at 6. Although the County will benefit financially from the scheme by receiving a percentage of tipping fees and free disposal services for a limited amount of waste, this does not negate the fact that the County has not expended or invested any public funds and merely is capitalizing on its position as a regulator and licensor.

restrictions affect both the state actor and other market participants; thus, economic freedoms should be granted to the state as well as the private company. *See Reeves*, 447 U.S. at 439, 100 S.Ct. at 2278–79. A governmental entity which expends or risks no public money, however, is not subject to the vagaries of the market and need be afforded no corresponding freedom. In addition, the market's inherent protection from abuse disappears when no public money is risked because only the private investor is affected by the government's unilaterally imposed policy.[7]

Ignoring the economic differences between its actions and those at issue in the relevant Supreme Court cases, the County emphasizes the structural similarities between Boston's workforce restrictions in *White* and its alleged geographic restrictions on the origin of waste. The County asserts that both cases involve situations where the governmental entity was reaching beyond the contractual parties to limit third parties. The city order in *White* would affect subcontractors who did not hire city residents and the County's action in this case would harm persons from outside of the 150–mile limit who wanted to dispose of their waste.

Despite these superficial similarities, the Court's reasoning in *White* undermines the County's analogy. The *White* Court decided that the facts fell within the market participant exception even though the restriction affected parties beyond the boundary of formal privity of contract because the city policy addressed a "discrete identifiable class of economic activity in which the city is a major participant." *White*, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. The *Wunnicke* court interpreted *White* narrowly on this point, noting that the doctrine does not allow any

requirement as long as the party is in contractual privity with the state. *Wunnicke*, 467 U.S. at 96–97, 104 S.Ct. at 2245. The *Wunnicke* Court pointed out that if a state were allowed to impose such restrictions on any party it contracted with, then the fact that the workers in *White* were "in effect working for the city" would have been irrelevant because the restriction could have been imposed on any employer conducting business with the city. *Wunnicke*, 467 U.S. at 97 n. 10, 104 S.Ct. at 2245 n. 10.

Long County does not fit within the market participant doctrine set forth in *White* and later interpreted by *Wunnicke*. First, the County is not a major participant in the market. The proposed landfill was a regional site to be used for waste from the counties and states surrounding Long County as well as waste from the County itself. The County concedes that it would not be the exclusive purchaser of the facility's services. According to Allsafe, the waste actually generated by the County was a minor portion of the company's contemplated activity. The County argues that its indispensable role in establishing a waste disposal facility renders it a major participant in the market. The need for County participation, however, has more to do with the regulatory scheme and the need for a license than the County's economic weight as a purchaser.[8] The market for waste services also extends beyond Long County and the fact that the County is needed for this particular plant operation does not render it a major participant in the overall market for the disposal of solid waste.

Second, Long County's actions can be distinguished from Boston's market participation in *White* because the County did not impose its restriction during the bargaining process before the contract was signed.[9] All-

---

7. For example, if the County invested money in the landfill facility, it might be less likely to restrict the origin of waste because of the lower return on its investment.

8. The contract provides that the County grants Allsafe a license to operate the waste disposal facility for twenty-five years, renewable for another twenty-five years if the company complies with its obligations under the contract. Further-

more, the County agreed to cooperate in the preparation stage, which would include helping Allsafe deal with the bureaucracy of various regulatory agencies.

9. The contract, in fact, specifically allows for the collection of waste originating outside of the County, as long as the process is in accordance with federal and state laws.

safe was subject to an alleged resolution and to a series of demands imposed after the contract.[10] At that point, it could not decline to participate without losing its investment and the amount it had paid for the rights under the contract. In contrast, the city order at issue in *White* included the workforce restriction in the city's notice for bids, so the contracting company was aware of the condition if it decided to bid and could elect not to participate in a sale under that requirement.

Finally, a letter from the County Commission indicates that Long County sought to impose the geographic ban on waste by passing a resolution.[11] Such actions traditionally are considered those of a market regulator. As the Supreme Court stated in *Reeves*, "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace." 447 U.S. at 436, 100 S.Ct. at 2277.[12] Although the County's method of imposing a restriction would not automatically constitute a Commerce Clause violation, the means combined with the timing is dispositive. The County would be acting as a regulator and not a market participant if it sought to impose geographic limits by resolution or rescission after the contractual agreement had been signed. According to the facts alleged by Allsafe, this is not a case of an economic actor " 'exercis[ing] his own independent discretion as to parties with whom he will deal.' " *Reeves*, 447 U.S. at 439, 100 S.Ct. at 2278 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). Purchasers, traders and manufacturers could not unilaterally impose post hoc conditions on a sale.[13]

For these reasons, the instant case is readily distinguishable from *Alexandria Scrap, Reeves* and *White* and more analogous to the scheme in *Wunnicke*. In that case, the State was using its economic power as a supplier of a natural resource to impose a restraint on the location of processing that resource. Here the County is using the unique features of the waste disposal market to impose geographic restrictions on the origin of the waste.[14] The County's cooperation is essential to the venture's success because of the complex regulatory scheme and the County was using its economic muscle as a licensor and regulator to dictate terms that ordinary buyers would not be able to impose

10. As stated in footnote 1, there is some controversy as to whether the geographic restriction was agreed upon and as to whether the Commission passed a resolution limiting the origin of waste. For the purpose of reviewing the Motion to Dismiss, we will accept the appellee's version of the facts and assume that the restriction was unilaterally imposed after the signing of the contract. *See* Plaintiff's Complaint for Injunctive and Declaratory Relief, R1–1 at § 12 and Ex. E.

11. The parties dispute whether a resolution was passed. We rely on the facts alleged in the complaint and the exhibits attached thereto. Exhibit E of plaintiff's complaint contains a letter informing OSI that a resolution had been passed limiting waste. R1–1 at Ex. E.

12. The County argues that it is not impeding the free flow of trade because its resolution and rescission of the contract do not prevent a private company from operating a landfill. However, the County ignores the practical obstacles to doing so without the County's aid. In addition, the County is impeding the flow of waste into the County.

13. Appellee is not challenging the resolution. Rather, Allsafe has attacked the County's decision to terminate the contract. If the trial court finds that the contract was rescinded for reasons wholly independent of the geographic restriction, then the Commerce Clause aspect of the case will be irrelevant. At this procedural stage, we merely hold that the appellant could prove a set of facts that would establish a Commerce Clause violation. We express no opinion as to whether appellant actually will be able to make such a claim when the case is tried on the merits and the trial court determines the reasons for rescission.

14. The *Reeves* Court noted that there was no suggestion in that case that the state had unique access to the materials needed to produce the cement. 447 U.S. at 444, 100 S.Ct. at 2281. Here, the County alone holds the power to grant a license and to aid the project in clearing regulatory and administrative hurdles. Moreover, the Georgia legislature has passed an act requiring that all cities and counties submit a waste management plan to the state. O.C.G.A. § 12–8–31.1. Allsafe argued that the rescission would prevent it from being included in the County's plan. Moreover, the district court found that the rescission would delay indefinitely the ability of the company to obtain a necessary operating permit from the State of Georgia Environmental Protection Division.

on private market participants.[15] Although the County claims that it was merely rescinding a contract, if this action was based on the geographic limitation, then the County was acting as a regulator regardless of the label placed on the transaction. *See Wunnicke*, 467 U.S. at 99 n. 11, 104 S.Ct. at 2246 n. 11 (noting that the Court is concerned with the nature of the policy rather than the label attached to it).

Additionally, the waste disposal service at issue is more comparable to a natural resource than to construction services, cement or auto hulks. In *Reeves*, the Court stated that cement was not a natural resource and then cited several Commerce Clause cases dealing with traditional natural resources. 447 U.S. at 443, 100 S.Ct. at 2281. Included among these cases was *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), which struck down a state statute limiting the origin of waste for a landfill to the state territorial boundaries. Courts tend to give more careful scrutiny to state policies which hoard natural resources because such policies implicate the core purpose of the Commerce Clause, the prevention of state barriers to the free flow of trade. *See Wunnicke*, 467 U.S. at 96, 104 S.Ct. at 2245 (distinguishing *Reeves* because the scheme at issue in that case did not affect a natural resource).[16]

The County attempts to limit the holding in *Wunnicke* to situations where the state is imposing a downstream restraint on a market in which it is not a participant. However, *Wunnicke* stands for the broader proposition that the market participant doctrine is not without limits and courts will scrutinize "the relationship of the subject matter of the contract and the condition imposed." *Id.* at 97 n. 10, 104 S.Ct. at 2245 n. 10. Here, the County's non-exclusive contract for the purchase of waste disposal services is not suffi-

ciently linked to the geographic restriction such that the County should be allowed to impose a post hoc condition which will affect other purchasers.

If the trial court finds that the County's rescission of the contract was based on the desire to impose a geographic limitation on the origin of waste, the County's actions would fall outside of the market participation exception to the Commerce Clause because Long County was not a major participant in the market, public funds were not expended or risked and the restriction allegedly was imposed after the contract was agreed upon.

### III.

■ Having rejected the County's primary argument for an exception to the Commerce Clause rule, we reach the issue of whether Allsafe could prove a set of facts establishing a Commerce Clause violation.

The Supreme Court first addressed the issue of prohibitions on the importation of waste for disposal in *City of Philadelphia v. New Jersey*. New Jersey had passed a statute which prohibited the importation of waste which originated outside the state. The Court overturned the lower court's finding that the movement of waste was not commerce and held that the issue was not immune from Commerce Clause scrutiny because "[a]ll objects of interstate trade merit Commerce Clause protection; none is excludable by definition at the outset." *Id.* at 622, 98 S.Ct. at 2534.

In determining the merits of the Commerce Clause claim, the Court noted that it had developed a rule of per se invalidation for economic protectionism and a more flexible approach for legislation that has other credible objectives. *Id.* at 623–24, 98 S.Ct. at 2535.[17] The Court decided that New Jer-

---

15. The *Wunnicke* Court also determined that the State was acting as a market regulator because it was attempting to impose conditions over which a seller usually has no say. 467 U.S. at 96, 104 S.Ct. at 2245. In the instant case, the County tried to control other purchasers, even though a non-exclusive minor buyer usually has no say over who else purchases a service.

16. The Court has held that "a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 627, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978) (citations omitted).

17. This more flexible test is set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct.

sey's outright prohibition on out-of-state waste was facially discriminatory and warranted application of the per se rule. *Id.* at 628, 98 S.Ct. at 2537. Accordingly, the Court found that the statute was unconstitutional.

Recently, the Court has addressed two other state schemes to limit the flow of waste from outside their borders. In one case, Alabama had passed a statute imposing an additional fee on all hazardous waste originating outside of the state boundaries. *See Chemical Waste Management, Inc. v. Hunt,* — U.S. —, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992). In the other, Michigan had passed a similar statute prohibiting counties from accepting waste originating outside of the county unless authorized by the county's waste management plan. *See Fort Gratiot Landfill v. Michigan Dept. of Nat. Res.,* — U.S. —, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). The Court found that both of the state practices violated the Commerce Clause.

The *Hunt* Court reaffirmed the holding in *City of Philadelphia v. New Jersey,* and reiterated the distinction between the two tests applied to possible violations of the Commerce Clause. The Court found that Alabama's statute was facially discriminatory and warranted "the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hunt,* — U.S. at —, 112 S.Ct. at 2014. The Court recognized that health and safety concerns may mandate a restriction on waste, but the State offered no explanation for the decision to limit only out-of-state waste. *Id.* at —, 112 S.Ct. at 2015. Because less discriminatory means were available to achieve the State's legitimate objectives, the Court declared the statute unconstitutional. *Id.* at —, 112 S.Ct. at 2017.

In *Fort Gratiot,* the Court again adhered to its decision in *City of Philadelphia v. New Jersey,* and noted that the two cases were very similar because like New Jersey, Michigan "has not identified any reason, apart from its origin, why solid waste coming from outside the county should be treated differently from solid waste within the county." *Fort Gratiot,* — U.S. at —, 112 S.Ct. at 2024. The Court considered this factor dispositive and rejected Michigan's argument that the limitation on out-of-county waste was distinguishable from state restrictions. The Court held that a state may not circumvent the Commerce Clause by using its subdivisions to impose a protectionist policy. *Id.* at —, 112 S.Ct. at 2024. The Court similarly was unpersuaded by Michigan's argument that the policy was unobjectionable because some of the counties accepted waste originating outside of their borders. The Court noted that this fact merely reduced the amount of discrimination, but did not address the counties that did prevent the importation of waste from other counties or states. *Id.* at —, 112 S.Ct. at 2025.

In the instant case, the County asserts that it has "allegedly imposed a waste origin limit to preserve the facility's capacity and protect the health of its residents."[18] The County claims that it should be allowed to pursue its program as a creative response to an important local problem. The County, however, has not given any reason why its objectives could not be accomplished without discriminating against other counties. As noted above, the County's actions are subject to the stricter test for a Commerce Clause violation and it must show that less discriminatory means for achieving its goal are unavailable. Supreme Court precedent dictates that the County's failure to meet this burden is dispositive and establishes a Commerce Clause violation. *See Fort Gratiot,* — U.S. at —, 112 S.Ct. at 2024.

The County further argues that its actions do not violate the Commerce Clause because the rescission of the contract prevents the facility from being built and has the effect of banning all waste disposal, not just waste from outside the County. Thus, the County

844, 847, 25 L.Ed.2d 174 (1970); it involves a balancing of the burden on commerce against local benefits. The Court will determine whether the local interest could be served in alternative ways that would have a lesser affect on interstate commerce.

**18.** Corrected Brief of Appellant Long County at 13.

distinguishes its actions from the statutes at issue in *City of Philadelphia, Hunt,* and *Fort Gratiot,* all of which had a discriminatory effect. However, this court cannot ignore the rescission. Long County could have decided not to contract for waste disposal services and not to license a potential provider of such services without violating the Commerce Clause; but once it decided to contract for services and then to place a restriction, it cannot escape constitutional scrutiny.

If this court were to ignore the County's intermediary actions and look only to the result, it would reward the County for acting unconstitutionally and allow future governmental entities to use rescission as a weapon to impose conditions that violate the Commerce Clause. Moreover, if Long County were to prevail on this argument, the County's actions would be immune from review because Allsafe would have to agree to the condition, preempting any claim, or risk rescission, which also would preclude relief. Such a result would insulate the County from judicial review of its actions.

IV.

■ A preliminary injunction will be reversed only if the trial court clearly abused its discretion. *United States v. Jefferson County,* 720 F.2d 1511 (11th Cir.1983). This circuit considers four factors in determining whether to grant a preliminary injunction; the movant must show: 1) a substantial likelihood of success on the merits of the case; 2) that movant will suffer irreparable harm if the injunction is denied; 3) that the injury to the movant from the denial of injunctive relief outweighs the damage to the opposing party if it is granted; and 4) that the injunction will not harm the public interest. *Id.* at 1519 (citation omitted). The County argues

that the district court's issuance of the injunction was clearly erroneous because Allsafe is unable to prevail on any of the four factors.

■ Long County contends that Allsafe cannot establish a likelihood of success on the merits because the company is not likely to prevail on its contract claim. The County claims that Allsafe's anticipatory repudiation of the contract gives Long County the right of rescission. The County specifically points to Allsafe's denial of its obligation to construct a recycling facility. In its letter of rescission, the County also noted that Allsafe had refused to pay $25,000 to employ engineers who would ensure that the project was not a public health or safety risk. The County additionally claimed to be concerned with the change in ownership of Allsafe and the company's refusal to provide financial security with regard to the entire project.

The district court found that the contract "appears to be valid and enforceable" against the County and that the County "appears to have no legal basis" for its rescission action.[19] Examining the contract, we conclude that the district court's findings are not clearly erroneous and that it has not abused its discretion in finding that Allsafe has a substantial likelihood of succeeding on its contract claim. Although the district court found no facts relevant to an agreement by OSI to abide by the geographic limit or as to whether such an agreement bound the successor companies, this omission is not clearly erroneous because defendant failed to explain these facts or make any legal arguments based on the facts.[20]

We also conclude that the district court did not abuse its discretion in ruling that Allsafe had established a likelihood of success with

**19.** District Court Order of June 30, 1992 at 5–6.

**20.** Long County made no legal arguments before the district court based upon OSI's agreement to the restriction nor did the County argue that Allsafe and GSW were subsequently bound by this agreement. *See* Defendant's Response to Plaintiff's Motion For Preliminary Injunction and For An Order to Show Cause and Defendant's Proposed Findings of Fact and Conclusions of Law as to Plaintiff's Motion for Preliminary Injunction. R1–12, R1–21. The County and GSW

disagree as to whether the decision to impose the restriction was unilateral or agreed upon. The district court did not clearly err in relying on GSW's version of the facts when the County failed to discuss any legal consequences to these facts or to allege facts concerning the successors to OSI. *See Blue Cross and Blue Shield of Alabama v. Weitz,* 913 F.2d 1544, 1551 (11th Cir. 1990) ("inclusion of a vague allegation" was insufficient to raise issue before district court and defeat motion for summary judgment).

the Commerce Clause issue. Accordingly, Allsafe has met its burden regarding the first factor of the test for an injunction.

■ The County contends that Allsafe failed to satisfy the second prong of the test because it will not suffer irreparable harm. The County claims that the district court confused speculative harm with irreparable harm. Furthermore, it attacks the district court's reliance on the affidavit of Allsafe's expert, alleging that it contains unfounded opinions by a party who has not established his qualifications as an expert.[21]

The district court determined that Allsafe would suffer irreparable injury because cities and counties would not be willing to enter agreements with Allsafe for waste disposal services due to the rescission. A review of the entire record reveals sufficient support for the district court's conclusion; thus, the district court did not abuse its discretion.[22]

■ Third, the County claims that the district court erred in finding that the County and public will suffer no harm if the injunction is issued. The County claims that the injunction prohibits it from holding hearings and otherwise participating in the decisions regarding the landfill and consequently, endangers the health and safety of residents. The district court characterized these arguments as conclusory and we agree. The County has offered no proof that the injunction will lead to any risk to health or safety. The injunction merely prevents the County from interfering with the contract. It appears that the County is arguing that enforcement of the contract will endanger the health and safety of its citizens; if that is the case, surely the County would not have signed the agreement. Presumably, the County will have the same amount of input into decisions that it would have under the

terms of the contract dealing with the planning and preparation stage of the operation.

■ Finally, the County argues that the injunction is vague and overbroad leading to some of the same alleged health and safety risks as mentioned above. In addition, the County contends that the injunction forces it to legislate by including Allsafe in its waste management plan. The injunction, however, does not reach beyond the obligations of the agreement which the County signed. For example, the contract specifies that the County recognized that state and federal regulations mandate that it develop a plan for disposal of solid waste. The agreement further states that "[t]he County has determined after public hearing and due deliberation, that it is in the public interest of the citizens of the County to enter into this agreement."[23] The County then authorizes the company to begin preparation of the facility to provide effective management of the County's waste. This language indicates that the County is entering into the agreement to fulfill its federal and state obligations, which would include the waste management plan. Thus, the injunction does not reach beyond the obligations that the County assumed when it signed the agreement.

## V.

We conclude that the district court correctly ruled that Long County failed to show beyond a reasonable doubt that Allsafe could prove no set of facts to establish its Commerce Clause claim. The County's action in rescinding the contract is not exempt from scrutiny under the market participant doctrine because the County did not invest, expend or risk public funds and the geographic limitation allegedly was imposed after the agreement was signed. We affirm the denial of the County's motion to dismiss.

---

**21.** The affidavit was given by Lawrence O'Neal, vice president of Allsafe, in lieu of testimony at a hearing regarding the preliminary injunction. Mr. O'Neal stated that he met with the Environmental Protection Division of the Georgia Department of Natural Resources and was told that GSW (formerly Allsafe) could not obtain a permit if it was not included in the Long County Waste Reduction Plan. Mr. O'Neal also stated that no county or city will discuss the possibility of including GSW in their waste management plans

unless the company has the ability to continue with the permitting and licensing process.

**22.** Because this deprivation satisfies the test for injunctive relief, we do not address the County's other arguments concerning the district court's ruling on the irreparable harm issue.

**23.** R1–22, Ex. A at 3.

We also conclude that the district court did not abuse its discretion in granting a preliminary injunction. The company satisfied its burden under the four prongs of the test for injunctive relief and the County's arguments were speculative and conclusory. Finally, we hold that the terms of the injunctive order are not unduly broad or vague.

Accordingly, the district court's orders are AFFIRMED.