HANSEN, Circuit Judge.
A corporation may obtain a license as a video lottery machine operator for the South Dakota Lottery only if residents of South Dakota hold the majority ownership interest in the corporation. S.D. Codified Laws Ann. § 42-7A-ri3 (Supp.1995). Chance Management, Inc., and William A. Sanders filed this suit, challenging the constitutionality of the residency requirement under the Commerce Clause, the Equal Protection Clause of the Fourteenth Amendment, and the Privileges and Immunities Clause. The district court[1] granted the defendants summary judgment. The court concluded that Commerce Clause restrictions do not apply to the statute because the state of South Dakota is acting as a market participant in the video lottery business. The court further held that the statute does not violate the Equal Protection Clause and that the plaintiffs have no standing to *1109 assert the Privileges and Immunities Clause ehallenge. The plaintiffs appeal. We affirm.
I.
In South Dakota, various forms of gambling are legal. See S.D. Codified Laws Ann. §§ 42-7-47 to -106 (1991 & Supp.1996) (horse and dog racing); id. §§ 42-7A-1 to -55 (South Dakota Lottery); id. §§ 42-7B-1 to -62 (card games and slot machines). South Dakota owns and operates one of the gaming enterprises in South Dakota, the South Dakota Lottery, which is a video lottery business. Video lottery consists of games of chance played on a computer-controlled video machine, simulating the games of poker, blackjack, keno, and bingo. South Dakota operates its video lottery business in accordance with Article III, Section 25 of the South Dakota Constitution, which, as amended in 1994,[2] reads as follows:
The Legislature shall not authorize any game of ... lottery_ However, it shall be lawful for the Legislature to authorize by law, a state lottery or video games of chance, or both, which are regulated by the state of South Dakota, either separately by the state or jointly with one or more states, and which are owned and operated by the state of South Dakota, either separately by the state or jointly with one or more states or persons, provided any such video games of chance shall not directly dispense coins or tokens.
Chapter 42-7A of the South Dakota Codified Laws establishes the state’s video lottery under the direction of an independent state agency, the South Dakota Lottery Commission (the Commission). S.D. Codified Laws Ann. § 42-7A-2 (Supp.1995). This chapter creates a detailed statutory scheme governing South Dakota’s video lottery business. See id. § 42-7A-1 to -55. An executive director administers the lottery pursuant to the provisions of Chapter 42-7A, id. § 42-7A-2, and under the rules and regulations promulgated by the Commission, id. § 42-7A-21.
South Dakota controls and operates its video lottery business in large part through a central computer system, which is located in the main office of the South Dakota Lottery in Pierre, South Dakota. Although the state does not own the video machines on which the games of chance are played or the modems attached to the machines, it owns the dominant software programs that operate the machines. The state owns the Erasable, Programmable, Read Only Memory (EP-ROM) chips in the video machines, without which the machines could not function. The EPROM chips contain the data that protects and secures the system from invasion by outside influences. In the first year of its operation, the state spent two million dollars on the central computer system, personnel, and related expenses.
Video lottery machine operators (operators) own the individual video machines and are responsible for their operation and maintenance. (J.A. at 49.) An operator places video lottery machines or associated equipment for authorized play in licensed video lottery establishments in South Dakota, including restaurants, bars, lounges, or lodging establishments licensed to sell alcoholic beverages on the premises. S.D. Codified Laws Ann. §§ 42-7A-l(6) (defining “licensed establishment”), -1(17) (defining “video lottery machine operator”). The state bills the operators for its portion of the revenue, receiving payment by electronically sweeping the operators’ bank accounts. S.D. Admin. R. 48:02:06:03 (1992). The state’s share of the net income was 37 per cent at the time the district court decided this case; the South Dakota Legislature has since increased the state’s portion to 50 per cent.
All video lottery machine manufacturers, distributors, and operators must obtain a license from the executive director of the *1110 South Dakota Lottery in order to do business with the Lottery. S.D. Codified Laws Ann. § 42-7A-41. Before issuing a license to any of these parties, the state undertakes a background investigation to ascertain whether the applicant qualifies for a license. Id. §§ 42-7A-43 (investigation), -13 (qualifications), -14 (ineligible persons); see also S.D. Admin. R. 48:02:02:01 (additional qualification requirements for licensure). A corporate applicant cannot obtain a license until each person who has the ability to control the corporation’s activities or to elect a majority of the corporation’s board of directors has passed the requirements set out for individual applicants. S.D. Admin. R. 48:02:02:02.
In addition to passing the background investigation, a person must be a resident of South Dakota to obtain a video lottery machine operator’s license. S.D. Codified Laws Ann. § 42-7A-43. If the party seeking an operator’s license is a corporation, a majority of the ownership interest in the corporation must be held by South Dakota residents in order to qualify for a license. Id.
Plaintiff Chance Management, Inc., is a corporation organized under the laws of the state of South Dakota and is owned by two persons. Plaintiff William A. Sanders, a resident of Wyoming, owns the majority (51%) of the stock in Chance Management, with the remaining shares (49%) owned by a South Dakota resident. Chance Management applied for a video lottery operator’s license but was turned down because its majority shareholder failed to meet the residency requirement under § 42-7A-43.
Chance Management and Sanders filed this suit against the state of South Dakota, the executive director of the state lottery, and various members of the state Lottery Commission. Plaintiffs challenged the constitutionality of the residency requirement under the Commerce Clause, the Equal Protection Clause of the Fourteenth Amendment, and the Privileges and Immunities Clause. Both sides filed motions for summary judgment. The district court granted the defendants’ motion, holding that the statute does not run afoul of either the Commerce Clause or the Equal Protection Clause. The court further held that the plaintiffs lacked standing to mount the Privileges and Immunities Clause challenge. See Chance Management, Inc. v. South Dakota, 876 F.Supp. 209, 211-13 (D.S.D.1995). Chance Management and Sanders appeal.
II.
We review the district court’s grant of summary judgment de novo. Independent Charities of Am., Inc. v. Minnesota, 82 F.3d 791, 795 (8th Cir.1996). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; Cotto Waxo Co. v. Williams, 46 F.3d 790, 792 (8th Cir.1995).
A. Commerce Clause Challenge
Under the Commerce Clause of the Constitution of the United States, “Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.... ” U.S. Const. art. I, § 8, cl. 3. This clause acts not only as an affirmative grant of regulatory power to Congress, but also “as a restriction on permissible state regulation.” Hughes v. Oklahoma, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). “This ‘negative’ or ‘dormant’ aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors.” Charities, 82 F.3d at 798 (citing New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988)).
Because the power granted to Congress under the Commerce Clause is the power to “regulate Commerce ... among the several States,” the correlative restrictions on the states under the Commerce Clause are invoked only when a state engages in regulation. Therefore, the Supreme Court has drawn a distinction between state “regulation of’ a market and state “participation in” a market. SSC Corp. v. Town of Smithtown, 66 F.3d 502, 510 (2d Cir.1995), cert. denied, — U.S. —-, 116 S.Ct. 911, 133 *1111 L.Ed.2d 842 (1996). See South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 93-95, 104 S.Ct. 2237, 2243-45, 81 L.Ed.2d 71 (1984) (plurality opinion); White v. Massachusetts Council of Constr. Employers, 460 U.S. 204, 208, 103 S.Ct. 1042, 104-45, 75 L.Ed.2d 1 (1983); Reeves, Inc. v. Stake, 447 U.S. 429, 436-37, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980); Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 808-10, 96 S.Ct. 2488, 2496-98, 49 L.Ed.2d 220 (1976). A state acting as a market participant is free from the strictures of the Commerce Clause because “there is no indication that the [Commerce] Clause was intended to limit the ability of the [s]tates themselves to operate in the free market.” Charities, 82 F.3d at 799. States acting in a proprietary capacity should be as free from federal constraints as are private market participants. Id.
We agree with the district court’s conclusion that South Dakota’s video lottery statute, including its residency requirement, falls within the market participant exception to the Commerce Clause. To begin with, the statute created a state business within the gaming market. South Dakota invested substantial sums of money to get the South Dakota Lottery off the ground. The state owns the dominant software programs that operate the video lottery machines and owns the computer system that controls the machine payouts. Moreover, the state presently reaps 50 percent of the revenue generated by the South Dakota Lottery. Thus, South Dakota is actively running a business in the gaming market. In furtherance of its money-making enterprise, the state has created a business relationship with its video lottery machine operators much akin to a partnership or joint venture between private parties. Because South Dakota’s choice of its “business partners” is made in its role as a market participant, its decision to deal only with corporations owned in major part by South Dakota residents is beyond the purview of the Commerce Clause. “[T]he [sjtate, like any private [gaming company], has a right to select the parties with whom it will deal.” Id. The lure of the huge profits to be made in the gaming market proved too attractive for the legislature. Instead of just taxing or regulating the other participants in the market, the legislature opted instead to be the largest participant, to own and to operate a huge piece of the action. That it is the dominant actor in the market does not mean it is not a participant.
The plaintiffs argue that the state is not acting as a market participant because it is not acting as a buyer, seller, or employer. The plaintiffs base this argument on the roles the states played in the three Supreme Court cases applying market participant exception. See White, 460 U.S. at 205-06, 103 S.Ct. at 1043-44 (employer); Reeves, 447 U.S. at 432, 100 S.Ct. at 2274-75 (seller); and Alexandria Scrap, 426 U.S. at 799, 96 S.Ct. at 2492-93 (buyer). The reasoning of these cases, however, does not support the plaintiffs’ argument. The Court’s inquiry in the market participation cases asks not whether the state is acting as a buyer, seller, or employer when it participates in a market, but whether the state is actually participating in a narrowly defined market as a proprietor rather than simply regulating the actions of other private market participants. Wunnicke, 467 U.S. at 94-95, 104 S.Ct. at 2243-45 (explaining White, Reeves, and Alexandria Scrap), at 97-98, 104 S.Ct. at 2245-46 (explaining that a state must actually be participating in the specific market it is regulating for the market participation exception to apply) (plurality opinion). We do not believe that it can seriously be questioned that South Dakota has invested substantial money and effort into participating in the narrowly defined gaming market as a proprietor.
The plaintiffs argue that the residency requirement is the functional equivalent of the statute the district court declared unconstitutional in Gulch Gaming, Inc. v. South Dakota, 781 F.Supp. 621 (D.S.D.1991). The statute at issue in Gulch Gaming imposed a residency requirement on operators or retailers engaged in gaming in Deadwood, South Dakota. S.D. Codified Laws Ann. § 42-7B-25. Although the statute at issue in Gulch Gaming appears to be analogous to the one presently before us, the state’s role in Gulch Gaming was entirely different from its role here. In Gulch Gaming, the state had no ownership interest in the gaming activity and was acting solely as a regulator of gambling *1112 conducted by private businesses in Deadwood. Here, however, the residency requirement reflects a decision by the state taken as an owner and operator of the gaming business.
The plaintiffs also contend that the residency requirement falls outside the market participation exception because the residency requirement is unrelated to the state’s participation in a private market. Plaintiffs point to the fact that the state imposes a number of requirements on video lottery machine manufacturers and restricts the manufacturers’ sales of the machines to licensed distributors and operators. Plaintiffs argue that under Wunnicke, this restriction violates the Commerce Clause.
Wunnicke involved a Commerce Clause based constitutional challenge to a requirement that timber harvested from Alaska state-owned lands be processed in Alaska prior to export. 467 U.S. at 84-86, 104 S.Ct. at 2238-39. In its market participant discussion, the Court first defined the relevant market, concluding that Alaska was a market participant in the timber industry as a seller of timber, but was not a market participant in the timber processing industry. Id. at 98, 104 S.Ct. at 2246. A plurality of the Court concluded that requiring private parties who purchased timber from the state of Alaska to process their timber in Alaska was a downstream regulation outside of the relevant market in which Alaska was participating and therefore not within the bounds of the market participation exception. Id. at 99, 104 S.Ct. at 2246-47. The Court explained:
The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the-market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market. Unless the “market” is relatively narrowly defined, the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry.
Id. at 97-98, 104 S.Ct. at 2245-46.
This language indicates that the market participant exception is limited to the actual market in which the state is participating, and to that extent, the plaintiffs’ assertion that the statute must be related to the state’s participation is correct. Once we determine that the state is participating in the relevant market, however, we do not scrutinize, under Commerce Clause analysis, whether the state’s proprietary decisions best meet the state’s goals. We further note that unlike Alaska in Wunnicke, South Dakota is actually participating in the market affected by the legislation at issue in this case. Moreover, the residency requirement for video lottery machine operators does not reach beyond those parties who are actually and freely dealing with the state in its business enterprise.
The plaintiffs rely on GSW, Inc. v. Long County, 999 F.2d 1508 (11th Cir.1993), to support a broader interpretation of the import of Wunnicke. In GSW, the Eleventh Circuit held that the county was not a market participant where a county resolution geographically limited the sources of the solid waste that a local private waste disposal facility could take. The facts of GSW are fundamentally different from those before us today, because the county had no investment in the market in which it asserted it was participating and had even made sure it would not be subject to any liability. By contrast, South Dakota has put substantial sums of money at risk in entering the gaming market. Furthermore, our analysis is simply not altered by the court’s language that, under Wunnicke, “courts will scrutinize ‘the relationship of the subject matter of the contract [or legislation] and the condition imposed.’” GSW, 999 F.2d at 1516 (citation omitted). Rather, that is precisely what we have done.
Our analysis is consistent with the Supreme Court’s decision in Wyoming v. Oklahoma, 502 U.S. 437, 461, 112 S.Ct. 789, 803-04, 117 L.Ed.2d 1 (1992). In that case, Oklahoma argued that it was acting as a market participant because it owned a utility. Not *1113 withstanding OHahoma’s participation in the market, the Court held that Oklahoma could not require private utility companies to purchase a certain percentage of coal from Oklahoma sources. The Court distinguished between a state’s imposition of limitations on its own utility business and the regulation of private companies, noting that the statute “would become a fundamentally different piece of legislation were it construed to apply only to the [state-owned utility company].” Id. at 461, 112 S.Ct. at 804. If the case before us today involved a residency requirement for corporations doing business with private gaming companies in which the state had no proprietary interest, this case would be like Wyoming v. Oklahoma.[3] However, we are considering “a fundamentally different piece of legislation”; the statute at issue in this case “applies only to the [state-owned gaming company].” Id. As such, the state’s residency requirement falls within the market participation exception to the Commerce Clause.
The dissent correctly notes that the Supreme Court struck down the entire statute in Wyoming v. Oklahoma, declining the state’s invitation to construe the legislation as applying only to the state-owned utility. We do not believe, however, that the Court’s decision not to construe the statute as sever-able or as intended to apply only to the state-owned utility affects our analysis. Indeed, as we have pointed out, the Court expressly distinguished legislation such as that before us, and left to “the Oklahoma Legislature to decide whether it wishe[d] to burden [its] state-owned utility when private utilities will otherwise be free of ... restrictions.” Id. See also SSC Corp. v. Town of Smithtown, 66 F.3d 502, 512 (2d Cir.1995) (holding that, although the county was a market participant in the waste disposal business, the county could not compel private parties to buy services from the local incinerator), cert. denied, — U.S. -, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996); Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 48 F.3d 701, 717 (3d Cir.1995) (holding that the state was not a market participant when it was using its regulatory power to go beyond its own participation and to control the market activities of private market participants); Swin Resource Sys., Inc. v. Lycoming County, 883 F.2d 245, 250 (3d Cir.1989) (upholding allegedly discriminatory rules concerning the county’s landfill because they did “not apply to private landfills and d[id] not apply beyond the immediate market in which [the county] transacted] business.”). The issue before us does not involve the state using “its regulatory power to control other[] participants in the [gaming] market.” Atlantic Coast Demolition & Recycling, Inc., 48 F.3d at 717. Rather, it involves a decision integral to the state’s choice, as a business, as to whom it will deal with as operators.
The state’s use of a licensing scheme rather than a contractual agreement does not take this case outside of the market participation doctrine, as the plaintiffs contend. See, e.g., Alexandria Scrap, 426 U.S. at 808-10, 96 S.Ct. at 2496-98 (holding that a state was acting as a market participant in its statutory scheme of giving in-state scrap processors preferential treatment); Charities, 82 F.3d at 799-800 (holding that a statute determining the eligibility for participation in a state employees’ charitable fund raising drive falls within the market participation doctrine). The state, like any private gaming company, is free to choose those with whom it will deal, be it through licensure or contract.
The plaintiffs and the dissent argue that South Dakota’s involvement in virtually every aspect of the South Dakota Lottery, as expressed in South Dakota’s amended constitution and state legislation, reveals that the state is actually regulating the market. We agree that the state’s involvement is pervasive, but cannot agree that this involvement is regulation of “the market.” To the contrary, we believe the state is administering its own business. The state, like the private gaming companies, is entitled to manage its business.
Finally, the plaintiffs argue that the market participation exception does not apply to this case because, by state constitutional mandate, the state of South Dakota has a *1114 monopoly in the video lottery business in South Dakota. Thus, the plaintiffs argue, the state is acting in its sovereign capacity. The Ninth Circuit Court of Appeals used this reasoning in Western Oil & Gas Ass’n v. Cory, 726 F.2d 1340 (9th Cir.1984), ajfd without opinion by an equally divided Court, 471 U.S. 81, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985). In that case, the state of California passed a statute and promulgated regulations, charging oil refining companies by volume for transporting petroleum in pipelines over and across state-owned tidelands and submerged lands. When the companies filed a Commerce Clause challenge to the statute and regulations, the state argued that it was a market participant in the petroleum transport business. The Ninth Circuit disagreed, focusing on the permanency of the plaintiffs’ refining facilities, which did not allow the plaintiffs any option but to lease from the state the submerged and tidewater lands upon which their pipelines rested. The court held that, under those facts, where the state had a monopoly and the companies had no choice but to renew their leases, the state was acting in its sovereign capacity as a regulator rather than as a market participant. Id. at 1343.
We are not entirely persuaded by the reasoning in Western Oil and Gas;[4] however, even if we were to agree, this case is different. This case does not concern an established business relationship between the state and a private party where the private party is raising a constitutional challenge to the state’s unilateral change to the terms of the “contract.” Nor does this case involve parties who are forced to continue to deal with the state because of the permanency of their facilities. Rather, it involves parties who are asserting they have a right to do business initially with the state, and the state determining that it does not want to do business with the parties. As such, we believe the plaintiffs’ and the dissent’s reliance on Western Oil & Gas is misplaced.[5] We further note that South Dakota’s residency requirement for its own business does not preclude Chance Management from dealing with the various private gaming businesses in South Dakota.
Having considered the arguments presented on this issue, we hold that the state of South Dakota is acting as a market participant in the gaming market by operating the South Dakota Lottery. Further, we hold that the state’s business decision to require that a majority interest of any corporate video lottery machine operator be held by South Dakota residents is not subject to Commerce Clause restrictions.
B. Equal Protection Clause
Sanders and Chance Management also contend that the residency requirement violates their equal protection rights under the Fourteenth Amendment. The plaintiffs concede that rational basis review governs their equal protection challenge. Under the rational basis standard, we presume legislation is valid and will sustain it if the classification drawn by the statute is rationally related to a legitimate state interest. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The statutory classification “need not be drawn so as to fit with precision the legitimate purposes animating it.” Alexandria Scrap, 426 U.S. at 813, 96 S.Ct. at 2499. Instead, the plaintiffs have the burden of proving that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational. City of Cleburne, 478 U.S. at 446, 105 S.Ct. at 3257-58. Moreover, a party challenging the legislation must negate “every conceivable basis which might support *1115 it.” FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) (internal quotations omitted). The plaintiffs contend that the state has not submitted a legitimate purpose for the residency requirement, and further, that the residency requirement is not related to any legitimate purpose.
We find that the residency requirement is rationally related to legitimate interests averred by the state. It is axiomatic that the state’s first submitted interest,- preventing illegal activities and infiltration by outside criminal elements into the South Dakota Lottery, is a legitimate purpose. Furthermore, we agree with the district court that “[g]ambling is generally understood to have a greater tendency to attract criminal infiltration than most other types of business enterprises.” Chance Management, 876 F.Supp. at 212. We note that in furtherance of its interest in protecting against the infiltration of criminal elements, South Dakota closely monitors the video lottery machine operators. The state undertakes an extensive background investigation on each applicant. Those investigations include contacts with foreign law enforcement bodies and sometimes require personal contact to conduct interviews and verify information. (J.A. at 50-51.) In addition, the state conducts periodic inspections of the operators’ premises. (J.A. at 51.) While the state’s use of a residency requirement to prevent criminal infiltration in its video lottery business may not be the perfect solution, a legislature could rationally conclude that the South Dakota Lottery can better protect the state’s legitimate interests if the corporate operators of the machines — who maintain the video machines and who collect and temporarily hold large sums of money from them — are owned in major part by residents of South Dakota.
We also agree with the district court that the state has a legitimate interest in insuring that the state’s substantial investment in its video lottery business ultimately benefits the South Dakota taxpayers. The legislature could have rationally concluded that a residency requirement would further this interest. Cf. Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel, 20 F.3d 1311 (4th Cir.1994) (holding statute was rationally related to state’s legitimate interest in directing benefits generated by state purchases to the citizens of the state).
Accordingly, we hold that § 42-7A-43 of the South Dakota Codified Laws does not violate the Equal Protection Clause of the Fourteenth Amendment.
C. Privileges and Immunities Clause
In their final claim, appellants argue that South Dakota’s residency requirement violates the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution, which states that “citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” The state responds that neither Chance Management nor Sanders has standing. The state further argues that if we hold that Sanders has standing, he should lose on the merits, because the South Dakota residency requirement does not burden a fundamental privilege or immunity covered by the Privileges and Immunities Clause, and because the state’s interest in the profitability and the integrity of its business enterprise is sufficient to survive scrutiny.
We need not reach the questions of whether the Privileges and Immunities Clause reaches the residency requirement and whether the state has carried its burden of justifying the statute, for neither Chance Management nor Sanders has standing on this issue. As a corporation, Chance Management cannot raise the Privileges and Immunities claim. Western & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 656, 101 S.Ct. 2070, 2076-77, 68 L.Ed.2d 514 (1981). Sanders, who has not applied individually for a license as an operator and whose only “injury” is that flowing from his status as a shareholder of Chance Management, also lacks standing. Smith Setzer & Sons, 20 F.3d at 1311.
Sanders attempts to distinguish the cases holding that an individual’s status as a shareholder is inadequate to create standing by noting that § 42-7A-43 prohibits nonresident individuals, as well as corporations owned in *1116 majority by nonresidents, from obtaining operator licenses. The residency requirement for individual applicants is not at issue here, however, for no individual in this case has applied for an operator’s license.
Sanders also points out that even though the corporation is the applicant in this case, he is by regulation required to meet individually the statutory requirements imposed by South Dakota Codified Laws § 42-7A-43, which provides for a background investigation and requires operators to meet certain qualifications to obtain a license. This argument is unpersuasive because it does not address the material question — whether Sanders has a cognizable injury under the Privileges and Immunities Clause. Regardless of the extra hurdles Sanders, as a shareholder, must overcome for Chance Management to obtain an operator’s license, the potential injury that denying the license to Chance Management may cause to Sanders flows directly and solely from the alleged injury to Chance Management, which is “not constitutionally cognizable under the Privileges and Immunities Clause.” Smith Setzer & Sons, 20 F.3d at 1317. We therefore hold that neither Chance Management nor Sanders has standing to bring the Privileges and Immunities Clause claim.
III.
For the foregoing reasons, we affirm the judgment of the district court.

. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

. The South Dakota Lottery began operating in October 1989. In 1994, the Supreme Court of South Dakota declared that the state was not actually running a lottery, but games of chance, in violation of the South Dakota Constitution. Poppen v. Walker. 520 N.W.2d 238 (S.D.1994). The South Dakota Legislature responded by passing a joint resolution amending the South Dakota Constitution to allow the South Dakota Lottery. The voters of South Dakota approved the proposed constitutional amendment, and in November 1994, under the amended Article III, Section 25 of the South Dakota Constitution, video lottery operations again commenced.

. Indeed, such a statute was struck down by the district court in Gulch Gaming.

. Regardless of our doubt about the reasoning in Western Oil & Gas, we agree with the result because the state was not actively engaged in the narrowly defined market of oil transportation and was for that reason not a market participant in that industry.

. The dissent finds the state’s recent increase of its share of the State Lottery revenue to be relevant to this case. We respectfully disagree. Our "activity-by-activity analysis," see post at 20, is confined to whether the state’s decision on the residency requirement falls within the market participation exception. Because neither Chance Management nor Sanders has challenged the state's decision to reap 50% of the revenue from its business (nor would they have standing to do so), we express no opinion on that issue.