1996 SD 39

THE CORNER POCKET OF SIOUX FALLS, INC., a South Dakota corporation, d/b/a The Pocket; Robert Remacle, d/b/a Ralph's Bar, County Seat and R & R Vending; G & T Gaming, Inc., a South Dakota corporation; R.E.L. Trust, a South Dakota business trust, R.E.L. Trustee Corp., Trustee; and J. Clifford Foley, d/b/a Foley's Bar, Plaintiffs,

v.

VIDEO LOTTERY TECHNOLOGIES, INC., a Delaware corporation; Music & Vending Association, a South Dakota corporation; James Koehler and Tim Hofer, d/b/a Hub Music and Vending; Leo Freidel; Jerry Freidel; Kerry Freidel; Freidel's Music and Recreation, Inc., a South Dakota corporation; Elroy G. Gruenewald; David A. Backlund; D & E Music & Vending, Inc., a South Dakota corporation; Robert J. Correa; Hasvold Vending Company, a South Dakota corporation; Den Schroeder; Musivend Enterprises, Inc., a South Dakota corporation; W.C. "Buzz" Oligmiller Rushmore Amusement, Inc., a South Dakota corporation; Manford Music & Vending, Inc., a South Dakota corporation; Michael J. Trucano; and Automatic Vendors, Inc., a South Dakota corporation, Defendants.

No. CIV. 94–1019.

United States District Court,
D. South Dakota,
Northern Division.

Nov. 6, 1996.

James M. Cremer, Kennith L. Gosch, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, Chester A. Groseclose, Jr., Richardson, Groseclose, Wyly, Wise & Sauck, Aberdeen, SD, Charles N. Nauen, Robert J. Schmit, Jean K. Janes, Lockridge, Grindal, Nauen & Holstein, Minneapolis, MN, for Plaintiffs.

Thomas John Welk, Michael S. McKnight, Boyce, Murphy, McDowell & Greenfield, Souix Falls, SD, Steven B. Ungar, Cosgrave, Vergeer & Kester, Portland, OR, for Defendant Video Lottery Technologies, Inc.

Robert C. Riter,Jr., Riter, Mayer, Hofer, Wattier & Brown, Pierre, SD, Edward M. Glennon, Laurance R. Waldoch, Lindquist & Vennum, Minneapolis, MN, for Defendant Music & Vending Ass'n.

Joseph M. Butler, Jeffrey Gilbert Hurd, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, SD, for Defendants James Koehler, Tim Hofer.

Jeffrey T. Sveen, Siegel, Barnett & Schultz, Aberdeen, SD, for Defendants Leo Freidel, Jerry Freidel, Kerry Freidel.

John S. Theeler, Morgan, Theeler, Cogley & Petersen, Mitchell, SD, Glenn A. Fingerson, Fingerson & Erickson, Huron, SD, Jerome B. Pederson, Fredrikson & Byron, P.C., Minneapolis, MN, for Defendants Elroy G. Gruenewald, David A. Backland, Britt Bruner, D & E Music and Vending, Inc., Robert J. Correa.

Gerald D. Johnson, Banks, Johnson & Colbath, Rapid City, SD, for Defendants W.C. Oligmiller, Rushmore Amusement, Inc.

Michael Charles Abourezk, Abourezk Law Offices, Rapid City, SD, A. Peter Fuller, Fuller, Tellinghuisen, Gordon & Eckrich, PC, Lead, SD, for Defendants Michael J. Trucano, Automatic Vendors, Inc.

James M. Cremer, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, for Interested Party Sports Promotions, Inc.

Lee M. McCahren, Vermillion, SD, for Interested Party SD Lottery.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANTS

BATTEY, Chief Judge.

### NATURE AND PROCEDURAL HISTORY

[¶ 1] Plaintiffs are video lottery machine licensed establishments and/or licensed operators in South Dakota who bring this class action individually and on behalf of other licensed video lottery machine operators and establishments. They seek damages and injunctive relief against the defendants, alleging a violation of the Sherman Act (15 U.S.C. § 1) and the Clayton Act (15 U.S.C. §§ 15 and 26).

[¶ 2] Specifically, plaintiffs allege that beginning sometime prior to October 1, 1989, defendants as co-conspirators engaged in a combination and conspiracy to unreasonably restrain trade. The conspiratorial conduct is alleged as follows: (1) agreement to fix the lease prices of space for the placement of machines; (2) agreement to refuse to deal with persons other than their own trade association; and (3) agreement to divide and allocate territories within the state of South Dakota for the placement of such machines. *See* Plaintiffs' First Amended Complaint, Docket #136, ¶¶ 30, 31. Plaintiffs further contend that the underlying effect of the

alleged combination and conspiracy was to: (1) suppress, restrain, and eliminate competition; (2) maintain at an artificially low and noncompetitive level the prices paid for lease of space to association members; (3) deny plaintiffs' access to video lottery machines, thereby restricting their ability to compete in the video lottery business; and (4) enjoin competition for the leasing of space for the machines. *Id.* at ¶ 33. Plaintiffs further allege fraudulent concealment of the conspiracy. *Id.* at ¶ 35.

[¶ 3] On July 15, 1996, defendants filed their Fed.R.Civ.P. 56 motion for summary judgment. Oral arguments were held on October 29, 1996. The Court has jurisdiction under 28 U.S.C. § 1331. The Court grants summary judgment to defendants as against all of plaintiffs' antitrust claims.

## STATEMENT OF FACTS

### [¶ 4]  A.  Video Lottery's Historical Background

[¶ 5]  The recent Eighth Circuit decision of *Chance Management, Inc. v. South Dakota,* 97 F.3d 1107, 1108–10 (8th Cir.1996), sets forth the historical background of video lottery in South Dakota. Additional facts material to the resolution of defendants' summary judgment motion are set forth below.

[¶ 6]  [In 1986 the South Dakota Constitution was amended to authorize a state lottery or video games of chance. *See* S.D. Const. art. III, § 25. On March 1, 1989, South Dakota enacted a statutory scheme authorizing video lottery games which became effective July 1, 1989. *See* 1989 S.D.Sess.L.Ch. 368 (codified as amended at S.D.C.L. ch. 42–7A, including S.D.C.L. §§ 42–7A–1, –3, –4, –8, –13 through –16, –36 through –50).] Video lottery consists of games of chance played on a controlled video machine simulating the games of poker, blackjack, keno, and bingo. *Chance Management,* 97 F.3d at 1108–09.

[¶ 7]  South Dakota's video lottery industry is highly regulated pursuant to a compre-

hensive statutory and regulatory scheme. *See* S.D.C.L. ch. 42–7A; A.R.S.D. ch. 48:02. The South Dakota Lottery is an independent state agency functioning under the direction of the South Dakota Lottery Commission which is empowered to administer the state lottery in order to provide overall management of the state lottery and control over the operation of the games. *See* S.D.C.L. § 42–7A–2. Although the state does not actually own the video machines, it does own the dominant software programs that operate the machines and it receives a percentage of the net machine revenue. *Chance Management, Inc.,* 97 F.3d at 1108–09.[1] Thus, South Dakota is a market participant in the state gaming market. *Id.* at 1113–14.

[¶ 8]  The video lottery statutes and administrative rules recognize the following four classifications of video lottery licensees:

(1) Manufacturers—entities responsible for the assembly or production of video lottery machines and associated equipment for sale or use in South Dakota (*See* S.D.C.L. § 42–7A–1(16); A.R.S.D. 48:02:01:01(1));

(2) Distributors—entities responsible for the distribution or sale of video lottery machines or associated equipment in South Dakota (*See* S.D.C.L. § 42–7A–1(15); A.R.S.D. 48:02:01:01(7));

(3) Operators—entities responsible for the purchase, service, maintenance, or placement of video lottery machines or associated equipment for public use in South Dakota (*See* S.D.C.L. § 42–7A–1(17); A.R.S.D. 48:02:01:01(11)); and

(4) Establishments—entities licensed to sell alcoholic beverages for consumption upon the premises where video lottery machines are located (*See* S.D.C.L. § 42–7A–1(6); S.D.C.L. § 42–7A–37.1; A.R.S.D. 48:02:01:01(9)).[2]

[¶ 9]  Only licensed manufacturers and distributors are authorized to sell video lot-

---

1.  At the start-up of video lottery, the state received a 22 percent share of the net machine revenue, which has since increased to 50 percent. *See* S.D.C.L. § 42–7A–63.

2.  The Court is cognizant of the fact that defendants contend that there is also an operator/establishment or hybrid licensee—licensed estab-

lishment owners purchasing and placing video lottery machines in that establishment only. *See* Defendants' Statement of Material Facts at ¶ 6 [hereinafter "DSMF at ¶—"] (citing S.D.C.L. § 42–7A–42). However, for purposes of this opinion, the Court will limit its discussion to the four classifications listed in the video lottery statutes and administrative rules.

tery machines. *See* S.D.C.L. § 42–7A–1(15)–(16). Licensed establishments may not purchase or own video lottery machines unless they have obtained an operator license. *See* S.D.C.L. § 42–7A–42. No more than ten video lottery machines may be placed in any licensed establishment. *See* S.D.C.L. § 42–7A–44; A.R.S.D. 48:02:11. Under the South Dakota video lottery scheme, manufacturers sell video lottery machines to licensed operators which in turn either lease the machines to licensed establishments or place the machines in their own licensed establishments, for a percentage of the profits of which the state receives a share.

[¶ 10] Between March 1, 1989, the date of legislative enactment, and October 16, 1989, the date of video lottery start-up, numerous establishments and operators made arrangements regarding placement of video lottery machines on the establishment premises.[3] There were two manufacturers approved and licensed by the South Dakota Lottery Commission prior to the date of video lottery start-up—Video Lottery Consultants (Video Lottery Technologies) [hereinafter "VLT"][4] (approved and licensed on September 24, 1989); SMS Manufacturing (approved and licensed on October 3, 1989).[5] Three months after start-up, there were six manufacturers with approved machines.[6]

[¶ 11] On November 14, 1989, the Lottery Commission adopted a policy prohibiting manufacturers and distributors from employing a business practice of refusing machine sales to operators within a certain class based on the type and size of their operation.[7] However, the policy did not mandate that manufacturers and distributors sell machines to every operator who expressed interest, as long as a refusal was based on "sound business practices" such as failure to demonstrate adequate financing to purchase the quantity of machines requested, late payments on machines previously ordered, or repeated problems in the service and repair of machines by an operator.[8] The Lottery Commission repealed the policy 14 months later.[9]

[¶ 12] Pursuant to a directive of the South Dakota legislature, a special legislative committee held a public hearing on September 16, 1993, regarding the ability of licensed operators to purchase video lottery machines and equipment.[10] Based on the testimony provided at the hearing, the Lottery Commission determined that there were several manufacturers of video lottery machines actively participating in the marketplace and that there was effective competition in the video lottery marketplace.[11]

3. *See* DSMF at ¶ 11 (citing Deposition of Mike Trucano at 35:25 to 36:14) (Feb. 21, 1996); DSMF, Tab 7 (Affidavits of Operators David Backlund, Elroy Gruenewald, Jerry Freidel, Tim Hofer, Mike Trucano, and Lloyd Freidel).

4. Video Lottery Technologies, Inc. (VLT) is a holding company, and one of its subsidiaries is Video Lottery Consultants, Inc. The particular video lottery machine made by VLT is referred to as a "VLC" machine.

5. *See* DSMF, Tab 1 at 5 (history and background section from defendants' joint memorandum in opposition to class certification (July 14, 1995)).

6. *See* DSMF at ¶ 13 (citing DSMF, Tab 2 (report to the Interim Video Lottery Committee on the ability of licensed operators/establishments to purchase video lottery machines and equipment in South Dakota (signed Nov. 2, 1993))). As of the commencement of this action, the following manufacturers had obtained manufacture licenses: VLC, SMS, Merit, Bally, TDC, Aristocrat, U.S. Games, IGT, Foxtronic, and PGI.

7. *See* DSMF at ¶ 14 (citing *In re Official Policy of the South Dakota Lottery, Sale of Video Lottery*

*Machines,* Nov. 14, 1989 (Docket # 163, Attachment 5); DSMF, Tab 1 at 7–8; DSMF, Tab 2)).

8. *Id.*

9. *Id.*

10. *See* DSMF at ¶ 15 (citing 1993 Sess.L.Ch. 318 § 5; DSMF, Tab 1 at 5–9; DSMF, Tab 2); DSMF at ¶ 16 (citing DSMF, Tab 1 at 6–7; DSMF, Tab 2 at 4–7). All of the named plaintiffs or their representatives were present at the hearing, and those who gave testimony at the public hearing included Robert Remacle (d/b/a Ralph's Bar, County Seat and R & R Vending); Terry Narum (The Corner Pocket of Sioux Falls, Inc.); Robert Thimjon (representing R.E.L. Trust/Ramkota Inns); and J. Clifford Foley. *See* DSMF at ¶ 17 (citing DSMF, Tab 1 at 7 n. 5). David Wisdom and Charles Huber of plaintiff G & T Gaming, Inc., were also present at the hearing, but did not provide testimony. *Id.*

11. *See* DSMF at ¶¶ 18, 19 (citing DSMF, Tab 2 at 7–8).

**[¶ 13] B. Parties**

[¶ 14] Plaintiffs can be categorized into the following two groups: (1) G & T Gaming, Inc., a South Dakota corporation, and R & R Vending are licensed operators, commonly referred as "true operators" in that they place video lottery machines in establishments owned by others; (2) The Corner Pocket of Sioux Falls, Inc., R.E.L. Trust (a trust to administer video lottery within Ramkota Companies), and Foley's Bar are licensed operators purchasing and placing machines in their respective licensed establishments.

[¶ 15] Defendants can be categorized into the following four groups: (1) Video Lottery Technologies, Inc. (VLT) is a manufacturer of video lottery machines which it sells to operators; (2) Music and Vending Association of South Dakota (MVA) is the trade association of the coin operators; (3) eight operator companies which are MVA members—Hub Music and Vending, Freidel's Music and Recreation, Inc., Musivend Enterprises, Inc., Rushmore Amusement, Inc., Automatic Vendors, Inc. and D & E Music & Vending, Inc., Hasvold Vending Company, Manford Music & Vending, Inc.; and (4) eleven individuals with interests in the eight operator companies—Jim Koehler, Tim Hofer, Leo Freidel, Jerry Freidel, Kerry Freidel, Roy Gruenewald, Dave Backlund, Bob Correa, Dean Schroeder, "Buzz" Oligmiller, and Michael Trucano.

[¶ 16] Video Lottery Consultants, Inc., founded by sole owner Larry Lippon, is now a subsidiary of Video Lottery Technologies, Inc. (VLT). From time to time, the acronym VLT and VLC are used interchangeably. VLT is a video lottery machine manufacturer and distributer as defined under South Dakota law. The particular video lottery machine manufactured by VLT is referred to as a "VLC" machine. At the start-up of video lottery, VLCs out-played the non-VLCs two to one, and today VLCs out play non-VLCs four to one.[12] It is undisputed that Larry Lippon developed a sales policy prior to video lottery start-up while manufacturing and selling video devices for the Montana market in which he would only sell his equipment to qualified coin operating companies that had experience and background in the amusement and vending business.[13] One of VLT's reasons for choosing qualified operators to place, service, and maintain its equipment included a desire to present the VLC product in the most desirable possible way to both the ultimate user as well as the purchaser of the equipment.

[¶ 17] Music and Vending Association (MVA) is a trade association whose members include the operator defendants. MVA has served as a trade association for the coin operator industry for decades, monitoring legislative issues and seeking to promote the interests of the industry.[14] During the years and months prior to enactment of the 1989 legislation authorizing video lottery, MVA members met and discussed proposed legislative schemes, including lobbying efforts.

[¶ 18] It is undisputed that the operator defendants had historically established service routes through prior lease arrangements with establishments for machines other than video lottery machines, based on economic and geographic concerns. South Dakota is a large state consisting of many small municipalities separated by expansive farming and ranch land. At video lottery start-up, the operator defendants ordered a variety of video lottery machines from various manufacturers and distributors, not restricting their video lottery machine orders to only VLC machines. The operator defendants were initially exposed to financial risks in purchasing the machines at a cost of approximately $5,000 per machine. With a statutory limit of ten machines to each establishment, this represented a sizable investment to the operators.

12. *See* Plaintiffs' Statement of Material Facts at ¶ 9 [hereinafter "PSMF at ¶——"] (citing PSMF, Tab 23 at 53:20–25, 54:1–8 (Deposition of Michael Trucano)).

13. *See* DSMF at ¶ 35 (citing DSMF, Tab 19 at 64:16 to 69:21; 97:13 to 99:22; DSMF, Tab 11 (Deposition of Leo Freidel); DSMF, Tab 2 at 5–7).

14. *See* DSMF at ¶ 73 (citing DSMF, Tab 24 at 19:1–15; DSMF, Tab 12 at 17:9–14; DSMF, Tab 8 at 41:1–16). The MVA was originally designated at the South Dakota Phonograph Operators' Association. The Association changed its name to MVA in 1962 via amendments to the articles of incorporation. *See* DSMF at ¶ 71 (citing DSMF, Tab 6 (Trucano Deposition Exhibit 191)).

**[¶ 19] C. Allegations**

[¶ 20] Plaintiffs allege that all of the defendants engaged in a combination and conspiracy to restrict or eliminate competition in the sale of VLCs or the lease of space for the placement of VLCs, in violation of Section 1 of the Sherman Act.[15] They allege that defendants formulated and effectuated the combination and conspiracy by agreeing to: (1) divide and allocate territories within South Dakota for the placement of VLCs; (2) refuse to deal with anyone other than MVA members or "MVA approved operators" in the sale of VLCs; and (3) fix the price of leasing VLCs and other video lottery machines.[16] Plaintiffs further contend that the conspiracy had the following effects: (1) price competition in the lease of space for placement of VLCs has been suppressed, restrained, and eliminated; (2) prices paid by MVA members for the lease of space for the placement of VLCs were maintained at artificially low and noncompetitive levels; (3) plaintiffs were denied access to VLCs, thereby restricting their ability to compete in the video lottery business; and (4) competition in the leasing of space for the placement of VLCs has been injured.[17] In their prayer for relief, plaintiffs request this Court to: (1) determine the conspiracy to be a violation of Section 1 of the Sherman Act; (2) enter judgment in favor of plaintiffs and members of the class for treble damages sustained by plaintiffs and class members; and (3) enjoin defendants from continuing, maintaining, or renewing the conspiracy.[18] According to plaintiffs, the conspiracy broke down in late 1993, after the legislative inquiry that led to the September 16, 1993, hearing regarding the ability of licensed operators to purchase video lottery machines and equipment in South Dakota.[19]

**[¶ 21] 1. Territorial Allocation**

[¶ 22] Plaintiffs allege that MVA members engaged in a conspiracy to allocate territories in South Dakota for leasing of space for placement of vending and video lottery machines.[20] In support of their conspiracy theory, plaintiffs allege that around May of 1989, before video lottery commenced in South Dakota, MVA members met at a location styled the "Goose Camp"[21] to discuss the areas in which each member would conduct its video lottery business.[22] Plaintiffs further allege that defendants utilized MVA meetings both to enforce and to further the ends of the conspiracy in the following manner:

(1) Defendants used MVA meetings to discuss formalization of their agreement through a "code of ethics" to "help govern actions of all fellow operators and that all association members must abide by such."

(2) Defendants imposed a two-year probation status on new "MVA" members to ensure that the new member lived up to the terms of the conspiracy.

(3) Defendant operators utilized their separately controlled pool and dart tournament corporation as an additional means of enforcing the conspiracy by threatening to deny eligibility to participate in this highly desirable corporation to new MVA members that did not comply with the terms of the conspiracy.

(4) At MVA meetings, defendants discussed both their territorial allocation and their agreement not to compete on price.[23]

[¶ 23] In furtherance of the conspiracy, plaintiffs allege that MVA members agreed not to service each other's accounts or at-

---

**15.** *See* First Amended Complaint at ¶¶ 29, 30.

**16.** *Id.* ¶ 31.

**17.** *Id.* at ¶ 33.

**18.** *See* First Amended Complaint at X (Prayer for Relief).

**19.** *See* PSMF at ¶ 68 (citing PSMF, Tab 27 (Affidavit of James M. Cremer (Aug. 13, 1996))).

**20.** *See* PSMF at ¶ 1 (citing PSMF, Tab 1 (Affidavit of Bill Welk (Aug. 12, 1996))).

**21.** The "Goose Camp" appears to be a group of hunting cabins near Gettysburg, South Dakota, owned by Jim Koehler, Tim Hofer, and Jack Theeler. *See* PSMF, Tab 1 at ¶ 11.

**22.** *See* PSMF at ¶ 7 (citing PSMF, Tab 1 (Affidavit of Bill Welk (Aug. 12, 1996))).

**23.** *See* PSMF at ¶ 63.

tempt to obtain an account belonging to another MVA member. If an MVA member's account contacted another MVA member the protocol was for the contacted MVA member to inform the account owner of the contact and give the account owner the opportunity to save the account. If an account belonging to an MVA member attempted to order VLCs, VLT also contacted the MVA member to inform the account owner of the contact to provide the account owner the additional opportunity to save his account. While MVA members would compete on new accounts and pursue accounts of non-MVA members, members would not try to take existing accounts from another MVA member.

[¶ 24] Plaintiffs contend that VLT agreed to adhere to MVA's territorial allocations for two reasons. First, MVA provided early support for VLT to obtain VLT's approval in South Dakota as the first video lottery manufacturer. Second, plaintiffs contend that VLT agreed to the MVA's territorial allocations because MVA had the power to ruin VLT's reputation with the national Amusement Association by representing that VLT does not support Association members.[24]

### [¶ 25] 2. Refusal to Deal

[¶ 26] During the initial period of video lottery start-up, VLT struggled to meet the market demands and production orders were often delayed. It is undisputed that VLT sold its VLC video lottery machines to members and non-members of the MVA.[25] However, plaintiffs contend that VLT usually only sold VLCs to non-MVA members when a non-MVA member had its attorney contact VLT or the non-MVA member threatened to

sue VLT. While VLT would often inform class member plaintiffs that there were no VLCs available, MVA members would obtain VLCs with little delay. Plaintiffs contend that VLT's sales policy of selling equipment only to what VLT considered to be qualified coin operating companies that had experience and background in the business was merely a sham, designed to cover up the fact that VLT had agreed to sell only to MVA members supporting VLT's application to become the first approved video lottery machine manufacturer in South Dakota.

[¶ 27] The following figure illustrates the numerical breakdown by percentage of VLC machines sold prior to and after the September 16, 1993, video lottery study committee hearing to: (1) MVA members; (2) purchasers approved by MVA and VLT; (3) purchasers who threatened to take legal action against VLT for refusing to sell; and (4) non-MVA members. See Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 37 [hereinafter "PRDSMF at ¶—"]. See also PSMF, Tab 27 at 2–3 (Affidavit of James M. Cremer (August 13, 1996) (filed under seal)). Submissions by defendants indicate the following number of machine sales to MVA and non-MVA members:

| YEAR | NON-MVA MEMBERS | MVA MEMBERS |
| --- | --- | --- |
| 1989 | 166 | 929 |
| 1990 | 423 | 1378 |
| 1991 | 345 | 1046 |
| 1992 | 202 | 452 |
| 1993 | 432 | 836 |
| 1994 | 636 | 350 |

See Second Affidavit of Jean L. Koepke at ¶ 13, Exhibit B (August 27, 1996) (filed under seal) (altering the numbers provided in the First Affidavit of Jean L. Koepke at ¶ 6 (DSMF, Tab 3) (emphasis added)).

---

**24.** See PSMF at ¶ 19 (citing PSMF, Tab 8 at 6).

**25.** See DSMF at ¶ 37 (citing DSMF, Tab 3 (First Affidavit of Jean L. Koepke)).

## VLC MACHINE SALES

TOTAL VLC's (before-5534; after-1469)
MVA (before-4307; after-534)
APPROVED LIST (before-555; after 85)
LEGAL ACTION (before-417; after-30)
NON-MVA (before-255; after-800)

**Figure 1**

[¶ 28]   **3.  Price Fixing**

[¶ 29]   It is undisputed that there is no evidence of predatory pricing by the operator defendants in regard to lease prices or in the prices charged by VLT for its machines to operators.[26]   Rather, plaintiffs contend that the inability to obtain VLCs has permitted the lease splits to be high in defendant operators' favor.   Plaintiffs allege that MVA operators agreed with each other and VLT to fix the price of supplying VLCs to licensed establishments.   The allegation stems from the proposed form contract supplied to MVA members from Mac Hasvold, which suggested a 40/60 profit split, establishments receiving 40 percent with operators receiving 60 percent.   The allegation is that the suggested split served as an artificial starting point, and operator defendants ultimately utilized a

50/50 split for the majority of customers and that defendant operators agreed with VLT not to permit VLCs to be resold to establishments or to place machines at overly generous splits to licensed establishments.   Plaintiffs allege that the VLT characterized splits deviated too much from the agreed upon 50/50 split as splits "tantamount to sale" and actively enforced the agreement by cutting off operators who offered such generous splits until said operators agreed to conform the 50/50 split.

[¶ 30]   Plaintiffs contend that this 50/50 profit split remained the norm until the lottery committee's investigation and hearing on September 16, 1993, after which the splits were reduced by 20 percent.   The following figure illustrates defendant MVA operator's share of net video lottery profits by percentage prior to and after the September 16, 1993, hearing.[27]

---

26.   *See* PRDSMF at ¶ 25.

27.   *See* PSMF, Tab 2 at Ex. 10 (Affidavit of James

M. Cremer (August 12, 1996) (filed under seal)).

# OPERATOR'S SHARE OF PROFIT

**Figure 2**

## SUMMARY JUDGMENT STANDARD

[¶ 31] Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–90, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

[¶ 32] In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson v.* *Liberty Lobby, Inc.,* 477 U.S. 242, 253–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The Supreme Court has instructed that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The non-moving party "must do more than show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

[¶ 33] Where there has been ample opportunity for discovery, summary judgment is appropriate in antitrust litigation just as in any other litigation upon a showing by the moving party of an absence of any genuine issue of material fact. *Willmar Poultry Co. v. Morton–Norwich Prod., Inc.,* 520 F.2d 289 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). This action was commenced on June 7, 1994. The file comprises 404 entries in ten files. There

have been over two dozen depositions of the parties and witnesses taken. Ample time for discovery has passed.

[¶ 34] The parties quarrel over the application of *Matsushita.* The teaching of *Matsushita* was further articulated by the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) where the Court said, *"Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." The Court expounded on this notion by reiterating its conclusion in *Anderson* that, "[s]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Eastman Kodak,* 504 U.S. at 468 n. 14, 112 S.Ct. at 2083 n. 14 (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). To survive summary judgment there must be evidence that "reasonably tends to prove" plaintiffs' theory; defendants meet the burden under Fed.R.Civ.P. 56(c) when it is conclusively shown that the facts upon which the nonmoving party relied to support the allegations were not susceptible of the interpretation which was sought to give them; only reasonable inferences can be drawn from the evidence in favor of the nonmoving party; and the Court must consider whether the inference of conspiracy is reasonable. *Id.* (citations omitted).

[¶ 35] Plaintiffs' response in opposition to defendants' motion for summary judgment invites the Court to apply *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970) and *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962), as a standard for summary judgment.[28] *See* Docket #374. The Court declines the invitation. Plaintiffs' reliance upon *Poller* and *Adickes* runs counter to the teachings of *Celotex, Anderson,* and *Matsushita.*

These cases disagreed with the idea that summary judgment is to be used sparingly. Plaintiffs fail to cite *First National Bank v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), an antitrust case decided by the Supreme Court six years after *Poller,* where the Court set forth that:

[T]o the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.,* 391 U.S. at 289–90, 88 S.Ct. at 1593. This case has been interpreted to soften *Poller* by rejecting the view that summary judgment "should, in effect, be read out of antitrust cases." *See* William W. Schwarzer, Alan Hirsch, and David J. Barrans, *The Analysis and Decision of Summary Judgment Motions: A Monograph on Rule 56 of the Federal Rules of Civil Procedure,* Federal Judicial Center, at 4 (1991).

[¶ 36] The clear example of the use of summary judgment in an antitrust case is *Matsushita,* involving a conspiracy to fix prices, in which summary judgment was affirmed for defendants. Finally, should there remain any doubt as to whether the courts continue to harbor any antagonistic feeling toward resolution of summary judgment motions in antitrust cases, Chief Justice Arnold in *City of Mt. Pleasant, Iowa v. Associated*

---

**28.** During oral arguments on the motion for summary judgment, plaintiffs also made the argument that a nonmoving party's burden under the standard for evaluating summary judgment is lower than that of a nonmoving party defending against a motion for directed verdict. Such an inference is clearly misplaced. *See Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("If the defendant in a ... civil case moves for summary judgment or for a directed verdict ..., [the inquiry is] whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict").

*Electric Co-op., Inc.,* 838 F.2d 268 (8th Cir. 1988) laid such thoughts to rest. He stated that, "a trilogy of recent Supreme Court opinions demonstrates that we should be somewhat more hospitable to summary judgment than in the past. The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." *Id.* at 273.

■ [¶ 37] Based on the foregoing, the trilogy of *Celotex, Anderson,* and *Matsushita* provide the Court with a methodology in analyzing defendants' motion for summary judgment. *See generally* 1 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 5.04 (2d ed.1991) (discussing the standards for granting summary judgment that have emerged from *Matsushita, Celotex,* and *Anderson*). Under this trilogy, it is incumbent upon the nonmoving party (plaintiffs), based upon the showing set forth by the moving party (defendants), to establish significant probative evidence to prevent summary judgment. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 (8th Cir.1991).

[¶ 38] Plaintiffs have been unable to sustain their burden in the face of defendants' showing. Plaintiffs' conspiracy allegations are based solely upon surmise, conjecture, and conclusions from unsupported facts.

## DISCUSSION

■ [¶ 39] Section 1 of the Sherman Act proscribes "(e)very contract, combination ... or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. A successful claim under Section 1 of the Sherman Act requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *E.S. Dev., Inc. v. RWM Enter., Inc.,* 939 F.2d 547, 553, 556 (8th Cir.1991); *Rosebrough Monument Co. v. Memorial Park Cemetery,* 666 F.2d 1130, 1138 (8th Cir.1981). *See also Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993) (citing *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1158 (5th Cir.1992), *cert. denied sub nom. Dillard v. Security Pacific Corp.,* 506 U.S.

1079, 113 S.Ct. 1046, 122 L.Ed.2d 355; *Wilder Enter., Inc. v. Allied Artists Pictures Corp.,* 632 F.2d 1135, 1139 n. 1 (4th Cir.1980); *Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 844 (9th Cir.1980); *cf. Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356). Plaintiffs' proof fails to establish the first element of their antitrust claim.

■ [¶ 40] An antitrust plaintiff is not required to prove the existence of a formal agreement among defendants to establish a combination or conspiracy. *E.S. Dev., Inc.,* 939 F.2d at 553 (citing *Reed Bros., Inc. v. Monsanto Co.,* 525 F.2d 486, 495 (8th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976)). "Indeed, it is axiomatic that the typical conspiracy is 'rarely evidenced by explicit agreements,' but must almost always be proved by 'inferences that may be drawn from the behavior of the alleged conspirators.'" *E.S. Dev., Inc.,* 939 F.2d at 553, 554 (citing *H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir.1981); *Michelman v. Clark–Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982)). Furthermore, "an antitrust plaintiff may prove the existence of a combination or conspiracy by providing either direct or circumstantial evidence sufficient to 'warrant a ... finding that the conspirators had a unity of purpose or common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *E.S. Dev., Inc.,* 939 F.2d at 554 (citing *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946), *quoted in H.L. Moore Drug,* 662 F.2d at 941; *Cheatham's Furniture Co. v. La–Z–Boy Chair Co.,* 728 F.Supp. 569, 571 (E.D.Mo.1989), *aff'd,* 923 F.2d 858 (8th Cir.1990); *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984)). However, even though all evidence and reasonable inferences are to be viewed in the light most favorable to plaintiffs, the nonmoving party, "the range of permissible inferences from ambiguous evidence is limited in a section one case." *Lovett v. General Motors Corp.,* 998 F.2d 575, 578 (8th Cir. 1993) (citing *Matsushita,* 475 U.S. at 588, 106

S.Ct. at 1356). Stated somewhat differently, "(c)onduct that is consistent with permissible competition as with illegal conspiracy, does *not,* standing alone, support an inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356 (citations omitted) (emphasis added). VLT's statement through Larry Lippon pertaining to the desire to present the VLC product in the most alluring fashion establishes a legitimate factual reason for its policy of selling only to selected operators.

▌ [¶ 41] In considering a summary judgment motion, the Court must consider only the evidence that is admissible at trial in determining whether the evidence is sufficient to enable a reasonable jury to conclude that a combination or conspiracy did exist, keeping in mind that all evidence and reasonable inferences are to be viewed in the light most favorable to plaintiffs as the nonmoving party. *Walker v. Wayne County, Iowa,* 850 F.2d 433, 434 (8th Cir.1988); *Multi–Tech Systems v. Hayes Microcomputer Prod. Inc.,* 800 F.Supp. 825, 844 (D.Minn.1992). *See generally Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1319 (8th Cir.1986) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985) ("[w]ithout a showing that admissible evidence will be available at trial, a party may not rely on inadmissible hearsay in opposing a motion for summary judgment.")).

▌ [¶ 42] Pursuant to Federal Rule of Evidence 801(d)(2)(E),[29] plaintiffs, the party offering the hearsay evidence, must prove "by a preponderance of the evidence that a conspiracy existed to which the declarant and the defendant were parties and that the statements were made in furtherance of the conspiracy." *United States v. Mitchell,* 31 F.3d 628, 631 (8th Cir.1994) (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987) (when the preliminary facts relevant to determining whether a statement is admissible under the co-conspirator exception to the hearsay rule are disputed, the party offering the statement has the burden to prove them by a preponderance of the evidence)). Consistent with this methodology, the Court has analyzed plaintiffs' *circumstantial evidence* and finds that plaintiffs' evidence fails to support the existence of a conspiracy, and assuming without conceding that a conspiracy existed, the statements were not made "in furtherance" of the conspiracy.

[¶ 43] At oral argument, plaintiffs acknowledged that they are strictly relying on circumstantial evidence to support their conspiracy theory. The circumstantial evidence produced by plaintiffs in support of their conspiracy theory for the most part consists of: (1) Bill Welk's affidavit setting forth the "Goose Camp" allegations (Affidavit of Bill Welk (Aug. 12, 1996), PSMF, Tab 1); (2) various clandestinely taped conversations, which specifically include: (a) the March 25, 1993, and July 8, 1993, conversations between defendant Jim Koehler of Hub Music and plaintiff Chuck Huber of G & T Gaming,[30] (b) the April 16, 1993, May 4, 1993, and August 30, 1993, conversations between former VLT employee Dana Waggener and plaintiff Chuck Huber,[31] and (c) the May 19, 1993, conversation between James Trucano, the brother of defendant Michael Trucano, and plaintiffs Chuck Huber and David Wisdom of G & T Gaming;[32] (3) demonstrative evidence of "conscious parallelism."

### [¶ 44]  A. Alleged Goose Camp Meeting

▌ [¶ 45] The only submission concerning the alleged "Goose Camp" meeting is the Bill Welk affidavit. *See* PSMF, Tab 1 (Affidavit of Bill Welk (Aug. 12, 1996)). Although the Welk affidavit could be stricken on procedural grounds for failure to timely disclose, a more appropriate substantive basis exists. According to Welk, he and defendant Jim Koehler were in a motel develop-

---

29. Statements are not hearsay when made by a co-conspirator during the course of and in furtherance of the conspiracy.

30. *See* PSMF, Tab 3 (Transcript of taped conversation, Koehler/Huber (March 25, 1993)); PSMF, Tab 7 (Transcript of taped conversation, Koehler/Huber (July 8, 1993)).

31. *See* PSMF, Tabs 4, 5, and 8.

32. *See* PSMF, Tab 6 at 3–4 (Transcript of taped conversation, James Trucano (May 19, 1993)).

ment partnership starting in 1989, which was later dissolved in October of 1991. *Id.* at ¶¶ 4, 5. He states that in or about May of 1989 he traveled with Koehler to a motel site to extend an offer on land upon which they built a Super 8 Motel that summer. *Id.* at ¶ 6. He further states in rather explicit detail that the two met in the morning at approximately 7 a.m. at which time Koehler allegedly informed Welk that he had been at a meeting at "Goose Camp" with members of the MVA for the purpose of discussing territorial allocations. *Id.* at ¶¶ 7–13. The undisputed evidence submitted by defendants unequivocally proves that the business relationship between Welk and Koehler did not even commence until January 19, 1990, and the construction of the cabin at the "Goose Camp" was not commenced until August 1989 and was not finished until the fall of 1989 when it would have been too late to allocate territories in light of the fact that the majority of the lease arrangements at issue had already been completed. *See* Docket #380. Thus, the Welk allegations pose a factual impossibility and thereby fail to raise any genuine issue of material fact.[33]

[¶ 46] **B. Alleged Surreptitiously Taped Conversations (Jim Koehler, Dana Waggener, and James Trucano)**

[¶ 47] Jim Trucano left South Dakota in early 1988, prior to video lottery start-up in 1989, and was not even tangentially involved with the process or with VLT. *See* Docket #379, Tab Q; Docket #380 at 21–22; Jim Trucano Deposition at 29:4 to 37:24, 42:5 to 44:16, 46:21 to 52:2, 55:16–18, 56:6 to 60:16, 62:2 to 63:2, 75:8 to 77:11 (containing Jim Trucano's disavowal's of personal knowledge). Plaintiffs have failed to produce probative evidence that Jim Trucano was either a co-conspirator or that any statements made were in furtherance of the alleged conspiracy. *Mitchell,* 31 F.3d at 631; *Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. at 2778–79.

[¶ 48] At the time Dana Waggener made his statements he was an employee of Williams Electronics, a competitor of VLT. *See* Docket #380 at 19. He was attempting to sell Williams Electronics' products to Chuck Huber of G & T Gaming; thus, Waggener clearly was not advancing VLT's objective. Thus it cannot be said he was acting in furtherance of any antitrust conspiracy.[34] *See United States v. DeLuna,* 763 F.2d 897, 909 (8th Cir.1985). In any event, the transcripts of the conversations along with the other evidence contained in the record fail to present a genuine material issue of fact upon which a reasonable jury could infer the existence of a conspiracy.[35]

[¶ 49] Finally, Chuck Huber of plaintiff G & T Gaming, Inc. placed two recorded telephone calls to plaintiff James Koehler of Hub Music & Vending. The obvious purpose of the conversations of March 25, 1993, and July 8, 1993, was an attempt to obtain inculpable statements in support of a suspicion of conspiracy. At oral argument plaintiffs urged the Court to find that they are admissible under Federal Rule of Evidence 801(d)(2)(A)–(D), admission by party oppo-

---

**33.** The Court notes that on September 12, 1996, plaintiffs submitted a second affidavit from Welk which recognized the problem associated with the timing of events described in the first Welk affidavit. *See* Docket # 398. Both the defendants and the Court anticipated the forthcoming of a third Welk affidavit to shed light on the predicament; however, at oral argument plaintiffs indicated that there is no third Welk affidavit. The time for discovery has long passed, and the Court must evaluate the evidence before it in determining whether plaintiffs have set forth sufficient evidence in support of their conspiracy theory.

**34.** In addition, the statements lack sufficient indicia of trustworthiness to warrant their introduction under the discretionary exceptions to the hearsay rule. *See* Fed.R.Evid. 803(24) and 804(b)(5).

**35.** The Court is aware of the Eighth Circuit decision of *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978), wherein the Eighth Circuit instructed that in the appropriate circumstances a district court could admit conditionally "the statements of alleged co-conspirators, subject to an on-the-record ruling that the statement is admissible under the co-conspirator exception to the rule against hearsay." *United States v. Ortiz–Martinez,* 1 F.3d 662, 673 (8th Cir.1993) (citing *United States v. Coco,* 926 F.2d 759, 761 (8th Cir. 1991)). However, in this case such an approach is not warranted in light of the fact that plaintiffs have failed to show by a preponderance of the evidence that the statements were made by co-conspirators in furtherance of a conspiracy, or that said statements along with other evidence of record comprise of evidence upon which a reasonable jury could infer the existence of a conspiracy.

nent. "An admission of a party opponent may be introduced as evidence against that party opponent only. It is not evidence against any other party in the case." David F. Binder, *Hearsay Handbook*, 431 (3d ed.1991). Since the complaint alleges an antitrust conspiracy, if the Koehler statements are admissible under Rule 801(d)(2)(A)–(D), they would not prove a conspiracy since they would only be binding on Koehler and would be hearsay as to all other party defendants unless admitted under Rule 801(d)(2)(E). For the same reason stated as to the failure of the Waggener and Trucano statements to meet the Rule 801(d)(2)(E) test, so also the Koehler statements fail the test of admissibility. The Court has reviewed the various conversation transcripts produced by plaintiffs in support of their conspiracy theory and all other evidence including the deposition exerts supplied by both parties, the Court concludes that said evidence is too ambiguous for a reasonable jury to infer that a combination or conspiracy existed. *See generally Lovett*, 998 F.2d at 578; *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356.

[¶ 50] In support of their price-fixing theory, plaintiffs contend that Mac Hasvold circulated a proposed form contract supplied to MVA members, which suggested a 40/60 profit split, establishments receiving 40 percent with operators receiving 60 percent.[36] *See* PSMF at ¶ 25 (citing PSMF, Tab 23 at 64, 65). A determination of whether it is reasonable to infer from the evidence that this form contract served as an artificial starting point for a conspiracy to implement a 50/50 split for the majority of customers requires additional inquiry into the record. First, the operator plaintiffs, including G & T Gaming, Foley, and Remacle, also negotiated 50/50 lease splits with establishments. *See* DSMF, Tab 13 at 22:13–19 (Joseph Foley Deposition); Tab 15 at 42:4–43:7 (Charles

Huber Deposition); Tab 23 at 130:9–131:6 (Robert Remacle Deposition). Moreover, prior to video lottery start-up, the operator defendants historically maintained a 50/50 profit split range with establishments for machines other than video lottery machines. *See* DSMF, Tab 31 at 102:1–12 (David Backlund Deposition), Tab 33 at 31:2–15 (Leo Freidel Deposition), Tab 34 at 14:8–18 (Lloyd Freidel Deposition), Tab 35 at 39:12 to 40:7 (Elroy Gruenewald Deposition), Tab 36 at 64:20 to 65:8 (Timothy Hofer Deposition), Tab 46 at 68:2–13 (Michael Trucano Deposition).

[¶ 51] In further support of their price-fixing theory, plaintiffs have submitted evidence that a 50/50 split remained the norm for the majority of the operator defendants until the lottery committee's investigation and hearing on September 16, 1993, after which the splits were reduced by 20 percent. *See* Figure 2 (illustrating defendant MVA operator's share of net video lottery profits by percentage prior to and after the September 16, 1993, video lottery committee hearing); PSMF, Tab 2 at Ex. 10 (Affidavit of James M. Cremer (August 12, 1996)). As defined by the Eleventh Circuit, "(c)onscious parallelism is uniform business conduct by competitors that permits a court to infer the existence of a conspiracy between these competitors." *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1456 n. 30 (11th Cir.1991) (citing *Interstate Circuit Inc. v. United States*, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939)). Proof of parallel business behavior alone is insufficient to establish a conspiracy. *Theatre Enter., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). As further explained by the Eleventh Circuit,

---

**36.** In his affidavit, Hasvold states that:

I obtained sample copies of written service agreements from other business located all over the country. I used copies of such agreement to write a draft. I took this draft to the attorney for Hasvold Vending. The attorney for Hasvold Vending made changes in the draft and put the Hasvold Vending agreements into final form. Hasvold Vending then used this written agreement in 1989 to sign up video lottery accounts.... I did not tell [plaintiffs

attorneys] that I individually, or on behalf of the MVA, supplied MVA members generally with a proposed form contract, or that I supplied such a form contract to anyone with suggested splits of 40/60 (40% to establishment and 60% to operator) or any split.... I supplied copies of any of these forms in blank to other operators if they requested the same from me.

*See* DSMF, Tab 29 at ¶¶ 8, 10, 11 (Affidavit of Mac Hasvold (Aug. 22, 1996)).

The idea behind this theory is that competitors' parallel business decisions are probative of the existence of a conspiracy between these competitors. The evidence used to support this theory is circumstantial. To ensure that we do not punish unilateral conduct, however, we require more than mere evidence of parallel conduct by competitors to support an inference of a conspiracy; an agreement is properly inferred from conscious parallelism only when "plus factors" exist.

*Todorov,* 921 F.2d at 1456 n. 30. These "plus factors" include actions contrary to the defendants' economic interests and a motivation to enter into such an agreement. *Petruzzi's IGA Supermarkets v. Darling–Delaware Co.,* 998 F.2d 1224, 1242 (3d Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). *See generally Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 884 (8th Cir.1978). Plaintiffs have failed to produce probative evidence relating to the existence of these plus factors.[37]

[¶ 52] Plaintiffs have also provided a demonstrative chart of the territorial allocations derived from the alleged conspiracy. *See* PSMF, Tab 26 (Affidavit of James M. Cremer, Ex. 9 (August 12, 1996)). It is undisputed that the operator defendants had historically established service routes through prior lease arrangements with establishments for machines other than video lottery machines, based on economic and geographic concerns.[38] Furthermore, it is also undisputed that at video lottery start-up, the operator defendants ordered a variety of video lottery machines from various manufacturers and distributors, not restricting their video lottery machine orders to only VLC machines.[39] Plaintiffs have failed to produce probative evidence to combat defendants showing that there was no conspiracy to allocate territories as to prevent summary judgment on that issue.

[¶ 53] On the refusal to deal issue, both parties have produced numerical data on the breakdown by percentage of VLC machines sold to MVA and non–MVA members. *See* Figure 1 and accompanying footnote (VLC Machine Sales). Furthermore, it is undisputed that Larry Lippon developed a sales policy prior to video lottery start-up while manufacturing and selling video devices for the Montana market in which he would only sell his equipment to qualified coin operating companies that had experience and background in the amusement and vending business.[40] One of VLT's rationales for choosing qualified operators to place, service, and maintain its equipment included a desire to present the VLC product in the most desirable possible way to both the ultimate user as well as the purchaser of the equipment.[41] A unilateral refusal to deal is no Sherman Act violation. *Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469 (citing *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) (noting that a manufacturer has a right to deal, or refuse to

---

37. As previously discussed, the 50/50 profit split was historically in action prior to the start-up of video lottery for other machines. Furthermore, the operator profit reduction merely reflects economic factors. The record indicates that the majority of the operator/establishment contracts initially entered into in 1989 were for a five-year term. As the expiration dates approached, the success of the industry had become apparent and new arrangements were negotiated to reflect conditions existing at that time. The gradual increase in the state's share of the video lottery revenue from 22.5 percent at start-up, to the present 50 percent share, played a role in the split reduction. The history of percentage revenue shares to the state of South Dakota is: 22.5 percent from October 1989 to December 1990; 25 percent from January 1991 to December 1991; 35 percent from January 1992 to June 1993; 36 percent from July 1, 1993 to June 1994; 37 percent from July 1, 1994 to June 1995; and 50 percent from July 1, 1995 to pres-

ent. Finally, as the success of video lottery became apparent, high volume establishments recognized the value of their customer base and demanded higher percentages of the total split, which operators were willing to renegotiate.

38. *See* DSMF at ¶¶ 30, 31 (citing DSMF, Tab 7; DSMF, Tab 8 at 71:5–14; DSMF, Tab 18 at 11:8–21 (Deposition of James Koehler)). *See also* PSMF, Tab 1 at ¶ 9.

39. *See* DSMF at ¶¶ 22, 48, 52, 58, 62, 63, 69, and 70.

40. *See* DSMF at ¶ 35 (citing DSMF, Tab 19 at 64:16 to 69:21; 97:13 to 99:22; DSMF, Tab 11 (Deposition of Leo Freidel); DSMF, Tab 2 at 5–7).

41. *See* DSMF at ¶ 36 (citing DSMF, Tab 19 at 64:16 to 67:3; DSMF, Tab 11).

deal, with whomever it likes, as long as it does so independently)); *Terry's Floor Fashions v. Burlington Indust.*, 763 F.2d 604, 610–11 (4th Cir.1985); *Aquachem Co., Inc. v. Olin Corp.*, 699 F.2d 516, 520 (11th Cir.1983). Furthermore, evidence of meetings alone is not sufficient to support a conspiracy. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Plaintiffs have failed to produce probative evidence to combat defendants' showing that there was no combination or conspiracy on defendants part to refuse sale of VLCs to non–MVA members as to prevent summary judgment on that issue.

[¶ 54] Because the Court finds that all defendants are entitled to summary judgment based on plaintiffs' failure to produce sufficient probative evidence that a combination or conspiracy existed between defendants, the Court need not inquire into the standards for evaluating whether the alleged restraint of trade is unreasonable. Likewise, the Court will not resolve the standing, state action doctrine, statute of limitations, doctrine of estoppel and waiver defense issues raised in defendants' motion for summary judgment.

### CONCLUSION

[¶ 55] After viewing the arguments presented by both parties and after reviewing the facts and inferences that may be derived therefrom in a light most favorable to the plaintiffs, this Court concludes that plaintiffs have failed to present sufficient probative evidence in support of their conspiracy theory as to create a genuine issue of material fact to withstand defendants motion for summary judgment. Accordingly, judgment shall be issued forthwith.